*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 28, 2017

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  16-cr-00021-JL
            v.                  *  January 26, 2017
                                *  Morning Session
SUZANNE BROWN                   *
* * * * * * * * * * * * * * * *  *
```

TRANSCRIPT OF JURY TRIAL DAY 5
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:

For the Government:     Seth R. Aframe, AUSA
                        Georgiana L. Konesky, AUSA
                        United States Attorney's Office
                        53 Pleasant Street
                        4th Floor
                        Concord, New Hampshire 03301


For the Defendant:      Bjorn R. Lange, Esq.
                        Dorothy E. Graham, Esq.
                        Federal Defender's Office
                        The Ralph Pill Building
                        22 Bridge Street
                        Concord, New Hampshire 03301



Court Reporter:         Liza W. Dubois, LCR, RMR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, New Hampshire 03301
                        (603)225-1442

1                          I N D E X

2

3  <u>WITNESS</u>                                            <u>PAGE</u>

4

   SUZANNE BROWN

5

        Continued Cross-Examination by Mr. Aframe       3
6       Redirect Examination by Mr. Lange               34
        Recross-Examination by Mr. Aframe               49
7       Continued Redirect Examination by Mr. Lange     60

8

9  Closing Arguments

10       By Mr. Aframe                                   73
        By Mr. Lange                                    98
11       By Mr. Aframe (rebuttal)                       109

12

13 Jury Instructions                                   112

14

15

16

17

18

19

20

21

22

23

24

25

```
1                  (Proceedings commenced at 9:03 a.m.)
2              THE CLERK:  The Court has before it for
3    consideration this morning day five of the jury trial in
4    criminal case 16-cr-21-01-JL, United States of America
5    versus Suzanne Brown.
6              THE COURT:  All right.  While the defendant is
7    retaking the witness stand, I'll ask you the usual
8    questions.
9              Have any of you had any conversations with
10   each other or anyone else during the recess regarding
11   the trial?
12             Have any of you had any sort of access to
13   media or Internet or investigations, any kind of
14   conducting investigations or conducting inquiries about
15   the matters involved in this case during the recess?
16             All right.  Well, then, we'll resume with the
17   defendant's cross-examination by Mr. Aframe.
18             Mr. Aframe, are you prepared to proceed?
19             MR. AFRAME:  Yes, Judge.
20             THE COURT:  Please.
21                  CROSS-EXAMINATION CONTINUED
22   BY MR. AFRAME:
23        Q.   Ms. Brown, I just have a few more topics that
24   I want to cover.
25        A.   Certainly, Mr. Aframe.  Good morning.
```

1        Q.    Good morning to you.

2             Let's -- let's look back at government's --

3    your Exhibit T.  And can you scroll through till we find

4    the budget.

5             Okay.  So we've gone over this yesterday.  You

6    remember talking about this; this is your narrative that

7    you submitted?

8        A.    Yes, Mr. Aframe.

9        Q.    And we looked at the proposed budget narrative

10   and I just want to ask you a few more questions about

11   it.

12       A.    Certainly.

13       Q.    Director of farm operations and education, you

14   proposed to use the grant to pay the salary of that

15   person, right?

16       A.    That's correct, although the salary listed in

17   the proposed budget narrative is 48,000 a year and

18   Mr. Meeh's salary was $40,000 a year.

19       Q.    Right.  But you proposed to pay someone $2,000

20   an hour at 24 hours (sic) -- I'm only asking you what

21   you proposed.  That's what you proposed?

22       A.    That's what I proposed and this was, excuse

23   me, before we had hired Mr. Meeh.

24       Q.    Right.  And the one that's really approved is

25   less than that, but I'm just asking what you proposed.

1      A.    Okay.

2      Q.    And then going to the next page, same thing

3 for the food systems person?

4      A.    Yes.

5      Q.    That's 2,000 hours at $24 an hour?

6      A.    Correct.

7      Q.    And the same thing for the director of

8 development, 2,000 hours at $24 an hour?

9      A.    That's what was proposed.

10      Q.    Right.  And let's go to 4 -- Maria, 4c, the

11 second page.

12            And this represents -- this is the 6/13/2011

13 update.  This is the reduced amount, right?

14      A.    Yes.  I'm just trying to clear the screen.  I

15 think I did.

16      Q.    Oh, okay.

17      A.    Okay.

18      Q.    This is the reduced amount that was ultimately

19 signed off on, right, 34?

20      A.    Correct.  These would be the averages.

21      Q.    Right.  34 hours a week at $24 for all three

22 positions, right?

23      A.    Right.

24      Q.    So to get all the money from the grant, you

25 would have to have the positions be billed equally,

1  right, because it's one position for 34.5 hours a week

2  at $24, right?

3       A.    I don't remember how that all came out in

4  terms of the proposal.

5       Q.    Okay.

6       A.    I really don't remember.

7       Q.    Okay.  But at least what we see here is what

8  is being represented here is three positions at $43,167

9  and then a breakdown of hours per position per week at a

10  certain rate of pay, right?

11       A.    That was the calculation, yes.

12       Q.    And if we multiply 43,167 times three, I will

13  represent to you it comes out to very much close to one

14  thousand -- $129,500.

15       A.    I --

16       Q.    Do you accept this?

17       A.    I would assume you are correct.

18       Q.    Okay.  So the promise -- the grant was three

19  positions for a grand total of $129,500, but each

20  position was going to be drawn down in equal increments;

21  that's what it seems like this says.

22       A.    I don't -- this is seven years ago that I

23  wrote this document.

24       Q.    Uh-huh.  Right.

25       A.    So I do not remember exactly everything I

1    wrote, how I wrote it, and why I wrote it.

2         Q.   Okay.  But --

3         A.   And this is a forward-looking statement and a

4    proposed statement.

5         Q.   Okay.  But -- fair enough.

6              We agree at least what this says on paper?

7         A.   We agree that what you are reading and what I

8    am reading are the same thing.

9         Q.   All right.  Fair enough.

10             So let's turn then to Government's Exhibit 12.

11   I'm sorry, 10.  And I'll get to it in a minute, but I

12   just want to make sure we remind us of some things that

13   were testified by you yesterday.

14        A.   Uh-huh.

15        Q.   You told us that you didn't actually have

16   people report hours to you?

17        A.   That's correct.

18        Q.   Because that would have been, I think your

19   words were, impractical?

20        A.   Yes.

21        Q.   And so what you did instead, you testified to,

22   was you gathered up various kinds of evidence,

23   materials, that were in your possession and you made an

24   educated guess on the number of hours that they worked?

25        A.   I spent a long time estimating and I also knew

1  that these people were working well in excess of the

2  hours that I reported.

3      Q.   Right.  And you did that from -- you told

4  us from 11:00 at night till 3:00 in the morning,

5  something --

6      A.   I was exhausted.

7      Q.   Right.

8      A.   Yes.

9      Q.   So it was work you did late at night?

10     A.   Right.

11     Q.   Because you wanted to finish these documents

12 and get them into the USDA?

13     A.   On a monthly basis, on time, yes.

14     Q.   Because your institute needed reimbursements?

15     A.   Correct.  We needed to keep --

16     Q.   Right.

17     A.   -- the institute running and we needed to make

18 sure the project was completed successfully.

19     Q.   Right.  Okay.  So I think we're agreed.

20          Okay.  So let's turn to the fourth -- to

21 the -- to the fourth page, I think, fifth page.  Can you

22 put that next to the -- that one next to Julie Moran's,

23 which should be the next page.

24          So this is the November -- -- these were

25 submitted with the October disbursement, right, the

1    October SF 270?  Do you want me to take you back to the

2    beginning so you can see how --

3        A.    No, no, that's okay.  I think since the

4    billing date's the same, the invoice month would be the

5    same for both of these women, yes.

6        Q.    So all of those calculations and work that you

7    did -- so Julie Moran was doing a certain kind of work

8    up in Coos County, picking up food, delivering it?

9        A.    Correct.  And the things that are actually

10   listed here under services.

11       Q.    Yeah.  And that came out, the way you did your

12   calculations, to 200 hours?

13       A.    To the best of my knowledge and belief, yes.

14       Q.    And Wilma Yowell, who was doing, it seems to

15   me from what I'm reading here, a significantly different

16   kind of work, you came up with 198 hours?

17       A.    Correct.

18       Q.    Two hours' difference?  That's right?

19       A.    Right.

20       Q.    I mean, that's not a trick question.

21       A.    Right.

22       Q.    A two-hour difference, right?

23       A.    Six years ago.

24       Q.    Yeah.  But two hour difference?

25       A.    Sure.

1      Q.    And you testified yesterday Wilma Yowell, you

2   said, was a development director and you looked up what

3   a development director makes and you thought it was

4   around $80,000; and that's a more sophisticated

5   position, right --

6      A.    Right.

7      Q.    -- than Julie Moran.  Julie Moran doesn't have

8   that background that Wilma Yowell has, right?

9      A.    Right.  And I actually checked my notes and

10  figures on that, what I said yesterday, last night and

11  I've brought that with me today.

12     Q.    Okay.  And so -- and you -- and you, I think,

13  told us yesterday that Wilma Yowell only billed $2,000 a

14  month, but that you thought that this was the fair

15  market value, right?

16     A.    This $4,752 per month --

17     Q.    Right.

18     A.    -- or for this month --

19     Q.    Right.

20     A.    -- was a fair market value for her services

21  rendered at that time as reported in the SF 270 as third

22  party in-kind services of the fair market value of that.

23     Q.    Right.  So in terms of real hours, this

24  doesn't represent what Wilma Yowell actually worked; it

25  just represents a number of hours times a rate of pay

1  which got to a bottom-line number that you thought

2  fairly represented Wilma Yowell; is that your testimony?

3      A.    Yes, because it was required by USDA that I

4  set one rate for all the three workers.

5      Q.    And so something you accomplished here was

6  that the director of development for October billed

7  within $48 of what the director of food systems billed,

8  right?

9      A.    That was my best estimate.

10      Q.    It was the same, almost?

11      A.    Well, nearly, yes.

12      Q.    Almost, right?  Okay.  Let's go --

13      A.    And I might add, Mr. Aframe, that I believed

14  that these women worked longer hours than that.  This is

15  just what I billed.  Because the invoice was required by

16  USDA; it had no internal value to my organization.

17      Q.    Uh-huh.  Let's go to Government's Exhibit 11

18  and let's do the same thing.

19          And so this is the next month?

20      A.    Correct.

21      Q.    And, again, you did those late night

22  calculations?

23      A.    Correct.

24      Q.    And this month they came out exactly the same?

25      A.    That's right.

```
 1         Q.    5,016 for Wilma Yowell --
 2         A.    Uh-huh.
 3         Q.    -- 5,016 for Julie Moran?
 4         A.    That's correct.
 5         Q.    So you got to bill -- you billed the director
 6    of development to USDA for the exact same amount that
 7    you billed the director of food systems?
 8         A.    Yes, and I have a reason for that.
 9         Q.    Can we go to the next one.
10               And this is the next month.
11         A.    Correct.
12         Q.    And, again, you did the same kind of late
13    night work to figure this out?
14         A.    Yes.
15         Q.    And Wilma Yowell, you billed $186 -- hours?
16         A.    Uh-huh.
17         Q.    And Julie Moran you billed $186 -- hours?
18         A.    Right.
19         Q.    At the same rate of pay?
20         A.    That's correct.
21         Q.    And so for both of them, they came out to
22    $4,464?
23         A.    That's correct.
24         Q.    And so you were able to -- or you did submit
25    submissions to USDA providing an equal amount for the
```

1  director of development and the food systems director?

2      A.   That's right.

3      Q.   Thank you.

4           And the next one.

5           And, again, we see the invoices of Julie Moran

6  and Wilma Yowell?

7      A.   That's correct.

8      Q.   And you did the same kind of work here with

9  the invoice -- with all the backup documentation that

10  you had?

11      A.   Adding one more step to this process.

12      Q.   What's the additional step?

13      A.   The additional step is that the USDA directive

14  1942-G mandates that you submit once a month only and

15  report reasonable hours.

16           So when I got to the woman who had done the

17  fewer hours, I made that for both.  One would do more

18  and one would do less.  And so I was being conservative

19  and I said, okay, well, let's say one of them did -- and

20  I don't remember; again, this is a long time ago.

21           Let's say one of them worked 250 hours and the

22  other worked 217 hours.  Well, to be conservative and to

23  report reasonable hours, I just capped it at 217 per

24  person.

25      Q.   Interesting.  So that's -- that sounds at

1    least to me different than yesterday, which was I

2    pictured you working late at night with all these

3    various pieces of paper and doing calculations --

4        A.    Oh, I did.  I did.

5        Q.    But now those calculations, you came up with

6    certain numbers and then said, ah, I'm not going to

7    declare those, I'm going to declare some other number,

8    based on some kind of cap that you created?

9        A.    A reasonable amount of hours.

10        Q.    Okay.

11        A.    And I don't think that USDA workers worked the

12    same way that these women worked.

13        Q.    Okay.  So -- but bottom line here is for

14    Wilma Yowell you declared 217 hours?

15        A.    Yes.

16        Q.    For Julie Moran, you declared 217 hours?

17        A.    Yes.

18        Q.    You declared $5,208 for Wilma Yowell?

19        A.    Yes.

20        Q.    $5,208 for Julie Moran?

21        A.    That's right.

22        Q.    So you billed the USDA the same amount for the

23    director of development as you did the food systems

24    person --

25        A.    That's correct.

1      Q.     -- no matter how much they really worked or

2    really did, because you just told us that.

3      A.     Right, because there was a limit to the grant.

4    Some of that money -- some of that time would have been

5    billed separately to the institute.

6      Q.     Precisely.

7           Next one.

8           And you did the same thing here?

9      A.     I did.

10      Q.     And here the cap was 203 instead of 217?

11      A.     Right.  One of them worked 203 hours and I

12    capped it at that for the other person.  And I don't

13    remember who did more and who did less.

14      Q.     Okay.  And so you billed USDA for the director

15    of development 4,872 and the director of food systems

16    4,872?

17      A.     Using my conservative calculations, yes.

18      Q.     Yeah.  And the benefit to NHIAF was that would

19    allow you to draw down the entire grant money because

20    you're putting in the same amount for each of the

21    positions that are listed under the grant?

22      A.     Commensurate with at least as much work as

23    these women put in, plus my own work, plus -- well,

24    Daimon had left us at that point.

25      Q.     So, yes, that's what you were able to do by --

```
 1        A.    Yes --
 2        Q.    -- by doing this?
 3        A.    -- absolutely.
 4        Q.    Okay.  And just one side question while I'm
 5   looking at Wilma Yowell's.
 6              In every one of them, I can go back, but you
 7   put down that she did farmer coaching.
 8        A.    Yes.
 9        Q.    She said she wouldn't even know how to coach a
10   farmer.  Was she not right about that?
11        A.    She was not right about that.
12        Q.    She would know how to coach a farmer?
13        A.    Absolutely.  If you looked at her
14   qualifications, and she talked about them, she has every
15   ability to coach farmers and did coach farmers and
16   worked with farmers.
17        Q.    And is it still your testimony that in
18   February of 2012, Wilma Yowell was working for you?
19        A.    Yes.
20        Q.    And just on that little side note for a
21   second, can we look at 41c.
22              This is the final -- this was the invoice that
23   was attached to the January e-mail that I showed you
24   yesterday where she said she was going to seek gainful
25   employment elsewhere.
```

1       A.    Right.

2       Q.    At least our records have no additional

3   invoices.  This was her last invoice, right?

4       A.    That is the last one that she submitted to me.

5       Q.    So your testimony is she continued to work --

6       A.    Yes.

7       Q.    -- was disgruntled about not being paid

8   because she sent you e-mails saying, where's my money,

9   we saw those already?

10       A.    They were cordial at that time, but later on,

11   May, June, they became increasingly irritated, which I

12   don't blame her for.

13       Q.    So she was in -- she continued to work for

14   you?

15       A.    Yes.

16       Q.    She was inquiring about not being paid?

17       A.    Right.

18       Q.    But your testimony is she never submitted

19   another invoice; this was it?

20       A.    That was it.

21       Q.    Okay.  Let's go back to the last -- the last

22   of the SF 270s.  27, I think is the last one.  Let me

23   just see.  I'm not sure.

24             Okay.  15.  15.

25             And this is the last one of these I would like

1    to look at.

2         A.    Sure.

3         Q.    And, again, they both come out with 119 hours?

4         A.    Correct.

5         Q.    The payment requested for each was the same?

6         A.    Correct.

7         Q.    So you were able to put in for the two

8    positions at the same amount of money?

9         A.    Uh-huh.

10        Q.    That allowed you to draw down the money in an

11   equal increment?

12        A.    Right.

13        Q.    And that's what you figured out, using all

14   that documentation you had in your office?

15        A.    119 was the time spent on work by one of those

16   women.  One of them did more.  And so I capped it at the

17   lower number in order to be conservative in my estimate.

18        Q.    And so this was the last month of the grant,

19   right?

20        A.    Of the first --

21        Q.    Of the first one, right?

22        A.    -- grant, that's correct.

23        Q.    Because if we look over here, March 2012,

24   that's when this was for?

25        A.    Uh-huh.

1       Q.    And in this month, you -- we looked at all the

2  other ones and it was up in the 200s, right, 200 hours,

3  209, and -- I mean, I can go back, but they were all --

4       A.    I think you probably should go back, because I

5  don't remember at this point.

6       Q.    Okay.  Well, I'll go back and look at 14.

7             There it's 203 hours.  Right?

8       A.    Correct.

9       Q.    And go back to the last -- one more, 13.

10            So these are not matched up.  You have --

11      A.    Okay.  I think I understand your point now.

12      Q.    All right.  So those were all 200 and -- over

13  200?

14      A.    Sure.  Exactly.

15      Q.    And in this month, it was only 119, right?

16      A.    That's right.

17      Q.    And you spent -- you ended up getting all of

18  the money that was available through the 2011 grant,

19  right?

20      A.    That's correct.

21      Q.    So for that last month, by declaring 119, you

22  just zeroed out the grant?

23      A.    I did, because there would be other charges

24  that the institute would have to pay these women.

25            This invoice was required by USDA.  It was not

1   a complete record of everything that these women did in

2   terms of the work they provided for the institute.

3        Q.   So your position is it's just something you

4   had to do to get the money?  These invoices didn't

5   matter, I think you've told us that, but you had to

6   submit them because USDA needed them for you to get the

7   money?

8        A.   No.  You're paraphrasing me.

9        Q.   Am I accurately paraphrasing?

10       A.   Yes, you are.

11       Q.   Okay.  Let's go to Government's Exhibit 44.

12            Can you blow that up.

13            So this is an e-mail you wrote to Wilma Yowell

14  in June of 2012.

15       A.   That's correct.

16       Q.   And let me just focus on the second paragraph.

17            We have all done good work on behalf of the

18  NHIAF mission, but without actual dollars in the door,

19  we are all considered to be volunteers.  I will

20  certainly let you know if the situation changes.

21       A.   That's right.

22       Q.   So there were no -- so this -- you're telling

23  Wilma in this e-mail there were no actual dollars in the

24  door for NHIAF, right?

25       A.   On June 4th, 2012, there was almost nothing.

1    Q.    Okay.

2    A.    We had just completed the software, we were

3  getting ready to start the growing season, and I did not

4  have the money to pay her and to keep the doors open for

5  the institute.  And I was dedicated to paying each and

6  every person that worked for the institute --

7    Q.    Can we go to --

8    A.    -- before myself.

9    Q.    Could we go to 53e.

10         So on June 4th of 2012, you had received --

11  what's 81,000 minus 12 -- $69,000 in USDA grant money,

12  right, if we go to May 2012, right?  She wrote this

13  e-mail June 4th, 2012.

14    A.    Right.

15    Q.    You had received -- so the grand total that

16  you ever received is 81,222, right?

17    A.    This chart doesn't give me the information

18  that I need to know for your question.  This is -- this

19  chart is a redaction of all the bank records.  I'd

20  rather see the original source than -- I believe

21  Ms. Redmond came up with this.  So I can't --

22    Q.    Do you disagree that you had been receiving

23  month after month after month at that point USDA

24  reimbursements into the NHIAF account?

25    A.    I do.

1      Q.    You do disagree with that?

2      A.    I'm sorry.  No, I agree that we were receiving

3   the money into the account.

4      Q.    And while the USDA did not come and drop cash

5   on your door, they did electronically transfer money

6   into your account?

7      A.    Correct.

8      Q.    And I think you've already agreed that the

9   point of that money was to pay people like Wilma Yowell?

10      A.    That's right.

11      Q.    But you --

12      A.    That was the intention.

13      Q.    But you chose not to and then when she asked

14   for her money, you say, we have no dollars?

15      A.    I said we have no profits.

16      Q.    Let's go back to Government's Exhibit --

17      A.    Oh, without dollars in the door.  And I was

18   referring to Wilma's efforts specifically in that

19   statement.

20      Q.    Oh, so that doesn't mean dollars in the door

21   in general; that means you didn't succeed in generating

22   commissions?

23      A.    She had not yet.  Sometimes commissions can

24   take months, even years in some cases, for large

25   accounts.

1      Q.   But you agreed she billed you for $9,500?

2      A.   I didn't ask her to, but, yes, that's what she

3  billed us for.

4      Q.   That's what she billed you for.

5           And you went ahead and billed for $42,000, but

6  that's a different problem.  She billed you for $9,000?

7      A.   Correct.

8      Q.   Presumably, whether you think that was right

9  or wrong, she would have been satisfied with $9,000,

10 since that was her bill?

11          MR. LANGE:  Objection.

12          THE COURT:  Do you -- you can accept or agree

13 with that.

14     A.   I disagree with that.

15          THE COURT:  You can not accept or agree; you

16 can accept or disagree.

17          THE WITNESS:  I disagree.

18     Q.   She submitted a bill, yes?

19     A.   Yes.

20     Q.   A bill -- do you agree that usually when

21 people submit a bill, that's what they're asking to be

22 paid?

23     A.   I agree with that.

24     Q.   And let's go back to 53e -- or you don't want

25 to accept 53e, but you do accept that you were receiving

1    NHIAF -- USDA reimbursements month after month after

2    month during this period?

3         A.    Yes.

4         Q.    And do you agree that they were in the 6- or

5    $7,000 range per month?

6         A.    Approximately, yes.

7         Q.    And so even -- and you do also agree, I think

8    you agreed yesterday, you actually received $21,000 from

9    the USDA based on the reimbursements you submitted for

10   Wilma Yowell.  You submitted $42,000 worth of

11   reimbursements?

12        A.    For Wilma Yowell?

13        Q.    For Wilma Yowell.

14        A.    I disagree with that.

15        Q.    Okay.  I don't think you disagreed with it

16   yesterday, but okay.

17              But you do agree --

18        A.    Because I didn't do the calculations --

19              MR. LANGE:  Objection.  Motion to strike.

20              THE COURT:  You understand.  It isn't

21   important whether she disagreed with it yesterday; it's

22   important whether the jury does.

23              MR. AFRAME:  Yup.

24              THE COURT:  You're free to question her and to

25   make assertions that you'd like her to accept or

1  reject --

2              MR. AFRAME:  Okay.

3              THE COURT:  -- but please don't testify.

4              MR. AFRAME:  Yeah.

5      Q.    So do you agree that you billed much more to

6  USDA than $9,500?

7      A.    Yes, I do.

8      Q.    Okay.  And so you received back from USDA more

9  than $9,500 for what she did?

10      A.    Correct.

11      Q.    But you didn't pay her a cent?

12      A.    No, I didn't.

13              Actually, I take that back.  I did give her

14  some money for gas and she also had her grocery

15  allowance.  And I have all that calculated sitting here

16  today after your questioning of yesterday.

17      Q.    So let me touch on something else for a

18  minute.

19              Julie Moran eventually challenged or

20  complained that she hadn't been paid, right?

21      A.    That's correct.

22      Q.    Right.  So she -- she -- so -- and your

23  reaction when she told other -- and, in fact, it's true,

24  right, you hadn't paid her?

25      A.    That's correct.

1    Q.    And she told other people that fact?

2    A.    That's correct.

3    Q.    And you responded to that by having a lawyer

4    send her a letter threatening her with a defamation

5    action if she didn't retract?

6    A.    Not that statement.  That statement was true.

7    But there were other statements made that were

8    completely untrue, which caused me to consult with our

9    attorney and for that letter to be sent.

10    Q.    Okay.  Let's go to Government's 51d.

11          And this is your letter to Mr. Robinson,

12    right?

13    A.    It is.

14    Q.    And so let's go to the second page of that.

15          And the next to last paragraph says:  I also

16    anticipate providing a follow-up report to our

17    congressional delegation regarding NHIAF's experiences

18    surrounding the federal grants application and

19    administrative process.

20    A.    That's correct.  I wrote that.

21    Q.    Mr. Robinson had sort of challenged you here

22    about your use of the grant monies; right?

23    A.    That's correct.

24    Q.    And one of your responses was you were going

25    to make a report to the congressional delegation, right?

1      A.    That's right.  That was an intention.

2      Q.    And turning to Government's I-14.  I'm sorry,

3  Defendant's I-14.

4            This is an e-mail from you to Julie and it

5  says:  Nobody stays on the team if they are petty and

6  complain to customers, not today, not in four weeks, not

7  ever.

8            Right?

9      A.    That's correct.

10      Q.    And so a farmer had complained to one of the

11  people who buys the produce that they had not been paid,

12  right?

13      A.    At that time, I did not know what was

14  happening.  I just had heard that there were complaints

15  in general.

16      Q.    And your reaction was -- and I can take you

17  through all these e-mails if you want, but do you agree

18  there were many e-mails we've already looked at where

19  you say the farmers had every right to be upset with

20  you.

21      A.    Absolutely, yes.

22      Q.    Okay.  And so somebody complained?

23      A.    Correct.

24      Q.    And your response was, essentially, if they do

25  that, they're out of the program?

1      A.    That we would not sell for them going forward.

2      Q.    Right.

3      A.    That their services -- that particular farm

4  would be discontinued --

5      Q.    Right?

6      A.    -- because I have a high standard of

7  professionalism.

8      Q.    All right.  So Mr. Robinson challenged you and

9  you threatened -- you suggested you were going to tell

10  the congressional delegation, right?

11      A.    May I see that statement again, please?

12            THE COURT:  Well, that's up to you.  I mean --

13            MR. AFRAME:  I mean, I thought we went through

14  that already, but ...

15            THE COURT:  Yeah, that's not the point.

16            The point is the lawyer asking the questions

17  decides what you see when you're asking the questions.

18  You can --

19            THE WITNESS:  Yes, your Honor.

20            THE COURT:  It's all right.

21            You can -- you can not remember, but you can't

22  really ask him questions.

23            THE WITNESS:  Okay.

24            THE COURT:  That's the point.

25            THE WITNESS:  I don't remember what it says

1    without seeing exactly what I wrote.  Because this is

2    very important.

3         Q.    Okay.  You remember that when Ms. Moran

4    challenged things at NHIAF, you threatened defamation;

5    you had a lawyer write her a letter?

6         A.    When she challenged things at NHIAF.

7    That's -- challenging NHIAF was not why I had the lawyer

8    write her a letter.  I'm trying to obey the laws of the

9    Court and answer the questions properly.

10        Q.    I understand.  Maybe it was a bad question.

11              The e-mail on the screen, somebody complained

12   to a customer, and I think you agree it was a farmer,

13   because under the subject line it says, producer

14   professionalism --

15        A.    Correct.

16        Q.    -- and your response was if they do that, we

17   will no longer serve them.

18        A.    That's correct.

19        Q.    Back to 51.

20              Mr. Robinson, right, had challenged your use

21   of the grant funds, right?

22        A.    That's correct.

23        Q.    And it says that you're going to follow --

24   provide a follow-up report to the congressional

25   delegation about the grant application and

 1    administrative process.

 2              That's what it says, right?

 3        A.    I said I would anticipate -- yes, that's what

 4    that says.

 5        Q.    And you didn't do it?

 6        A.    No, I did not do it.

 7        Q.    All right.  But you told him at that point in

 8    time he should expect you to do that?

 9        A.    Correct.

10        Q.    And turning to Government's Exhibit 38, this

11    is the letter that your lawyer wrote to Ms. Moran?

12        A.    Yes, I recognize it.

13        Q.    And do you agree that the -- that you were

14    asking her to cease and desist saying negative things

15    about NHIAF?

16        A.    And myself.

17        Q.    And yourself?

18        A.    (Nods head.)

19        Q.    And that further action could be taken if she

20    didn't?

21        A.    May I see where I wrote that or where

22    Mr. Malia wrote it, actually.

23        Q.    The last sentence, it says -- this is to

24    Ms. Moran, and Peter J. Malia, Jr., was your lawyer for

25    this matter?

1      A.    Yes.

2      Q.    As your November 2nd e-mail indicated that you

3  would take further action to the full extent of the law,

4  please know that Ms. Brown and the institute will do the

5  same if you publish any further defamatory statements.

6      A.    That's correct.

7      Q.    And back to Government's 51 for one more

8  minute.

9            Looking down at the third paragraph -- well,

10 actually, let's look at the Re:  line, the subject line.

11 All right?  It says 2012 rural business enterprise

12 grant?

13     A.    That's correct.

14     Q.    And let's go down to the third paragraph.

15           And it says:  When we were -- when -- I'm

16 sorry.

17           It's the fourth paragraph.  I'm sorry.  You're

18 right, Maria.  I'm wrong.

19           When we were awarded $18,000 to carry out the

20 training scope of work for the e-commerce software and

21 distribution, by the time of our disbursement, it became

22 clear that without other funding, we would not be able

23 to deliver both the training and then support the

24 execution of the delivery service.  As the entire

25 disbursement of the funds was to compensate myself and

1    Julie Moran, we both volunteered to accept the funds,

2    et cetera.

3           Right?

4       A.    Correct.

5       Q.    Now, you make it sound here like this

6    pertained only to the 2012 Rural Business Enterprise

7    Grant grant for $18,000, right?

8       A.    At the time, that was the only grant in

9    question.

10      Q.    But you did the exact same thing for the 2011

11   grant, right?

12      A.    That's right.

13      Q.    And you didn't tell Mr. Robinson that?

14      A.    At the time, he was talking about the 2012

15   grant.

16      Q.    And raising concerns about it?

17      A.    Yes.

18      Q.    And the same concerns would have applied to

19   the 2011 grant because you did the same thing?

20      A.    That's right, had we been talking about the

21   2011 grant at that meeting.

22      Q.    He didn't have that information at that time,

23   so he didn't ask?

24      A.    That's right.

25      Q.    And so you just didn't tell him?

1      A.    I was in listening mode in that meeting.

2      Q.    Okay.

3            THE COURT:  I didn't hear you, Mr. Lange.  Did

4  you want to say something?

5            MR. LANGE:  I withdrew the objection.

6      Q.    You were in listening mode.  Okay.

7      A.    I gave him the statement, I listened to what

8  he had to say, I followed my attorney's instructions.

9      Q.    And so -- I just want to get this last thing

10  clear.

11           So Wilma Yowell testified she quit in January.

12  That was incorrect?

13     A.    Incorrect.

14     Q.    When Wilma Yowell said she didn't authorize

15  the invoices, that was incorrect?

16     A.    That was incorrect.

17     Q.    When Julie Moran said she didn't authorize the

18  invoices, that was incorrect?

19     A.    That was incorrect.

20     Q.    When Daimon Meeh testified that he had

21  traveled to Coos County only once or twice during his

22  employment, that was incorrect?

23     A.    That was incorrect.

24     Q.    When Anne Getchell -- when Anne Getchell said

25  she went over the letter of conditions line by line,

1    that was incorrect?

2         A.    That was incorrect.

3         Q.    And when Sarah Charles said she never went to

4    any board dinners, that was incorrect?

5         A.    She attended board dinners.  That was

6    incorrect.

7         Q.    She was incorrect about that?

8         A.    She was incorrect about that.

9              MR. AFRAME:  No further questions.

10              THE COURT:  Redirect.

11                   REDIRECT EXAMINATION

12   BY MR. LANGE:

13        Q.    The prosecutor went over your resume in a lot

14   more detail than I did.  It was evident, I think, after

15   the jury heard the resume that you have a significant

16   business background.

17        A.    (Nods head.)

18        Q.    True?

19        A.    True.

20        Q.    How did that come into play when you were

21   applying for these two grants in 2011 and 2012?

22        A.    Well, my business background was looking at

23   the problem that we had to solve, which was basically

24   getting the North Country farmers to be more successful

25   and more profitable and, in a lot of cases, helping get

1    them out of debt.  And so I thought, after speaking with

2    Mr. Robinson, that these grants might fit the bill.

3            And so when I did the proposal, I thought to

4    myself, if we can build the institute and our house

5    crops so that we can actually create sort of an economic

6    engine for these folks, then we can help them.  And that

7    is why I applied for those two grants.

8        Q.    How about with respect to completing the forms

9    and carrying out the grant?  What in your background

10   prepared you or didn't prepare you to do that?

11       A.    The forms?  Well, I had never seen the forms

12   before in terms of -- like the SF 270, I had never

13   filled one of those out before.  We don't have them in

14   the military.  So I didn't have anything but the

15   instructions on those forms to go by when I -- when I

16   did the reporting.

17       Q.    Did you follow the instructions as you

18   understood them at the time?

19       A.    I did.  I followed the instructions as I

20   understood them at the time.

21       Q.    The prosecutor has just asked you about the

22   testimony from other witnesses which you say is

23   incorrect.

24       A.    That's correct.

25       Q.    I want to go to, first of all, the testimony

1    of Julie Moran.  I believe she indicated that she hadn't

2    authorized the invoices.

3        A.    That's what she said, yes.

4        Q.    And was that true?

5        A.    No, it was not true.

6        Q.    Chase, could we put up I-7, please.

7              Did you have her authorization to submit the

8    invoices?

9        A.    I did.

10       Q.    The jury has -- this is in evidence.

11             So this is an e-mail from Julie Moran early in

12   September of 2012, when you were parting ways:  Would

13   you kindly send to me what you submitted for invoices on

14   my behalf.

15             What does that indicate?

16       A.    That indicates that she authorized those

17   invoices.

18       Q.    The prosecutor has also asked you about

19   Wilma Yowell and how you calculated reimbursement.  What

20   you were seeking reimbursement for was what?  Explain

21   that again with regard to Wilma Yowell?

22       A.    With regard to Wilma Yowell, because she

23   didn't have a normal compensation plan, what I needed to

24   do was estimate the fair market value of the time that

25   she had worked for the institute during the billing

1    period.

2         Q.    What did you look at to estimate the fair

3    market value of services?

4         A.    I looked at the -- at payscale.com, I looked

5    at the range of what a nonprofit development director

6    should earn, and I used that as a guide.

7              And then I looked at the hours that she had

8    worked from my analysis of -- as I talked about e-mails,

9    text messages, phone records, and so forth, mileage

10   expenses, because you can see where people are traveling

11   and how much time it takes them to get from one place to

12   another.

13             So it was a difficult calculation.  It was

14   a difficult estimate.  But as I was instructed by

15   Anne Getchell, I needed to do the best I could and that

16   is what I did.

17        Q.    You don't recall her going through the forms

18   line by line?

19        A.    She did not go through the forms line by line.

20        Q.    What did she tell you again about hours?

21        A.    She told me about -- well, when I learned that

22   I needed to report on an hourly basis for everyone, I

23   said, Anne, you understand that none of these people are

24   compensated on an hourly basis.  And she just had this

25   look on her face and she said, well, just do the best

1    you can.

2        Q.    The prosecutor showed the jury both your --

3    both of your narratives for 2011 and 2012.  And in that

4    narrative, you are assigning hours and -- hours per

5    month and an hourly rate.

6        A.    Right.

7        Q.    That seems inconsistent with what -- what was

8    going on with respect to Yowell and Moran.

9        A.    Correct.  When you do a proposal, a lot of

10   times you're doing averages.  And, also, those are

11   forward-looking statements.  Like I would like to do

12   this, I am submitting this to you to kind of get an idea

13   of what you're going to do; but that's not really what

14   happens.  That's just in a proposal, just like any other

15   business proposal.

16            Actually, not like any other business proposal

17   because we were asked in the application to do an hourly

18   estimate.

19       Q.    You -- you talked about submitting reasonable

20   hours.  Where did you get that from?  You made reference

21   to a particular document and I don't know if the jury

22   caught it.  It's not in evidence.  I know that.

23       A.    I believe we have it in evidence as 1942-G.

24   It's the -- it's supposed to be the RBEG grant for

25   dummies.  It's highly technical.  I've read through it

1 and I did the best I could with what I could understand.

2 There were no YouTubes, no training, no training

3 documents, no PowerPoints to help me understand this

4 grant.  And to the best of my knowledge, there is still

5 no training program for recipients of these grants that

6 USDA offers.

7   Q.    Back to my question.  Was there something

8 within that -- within that -- those guidelines that

9 dealt with hours?

10   A.    Yes.

11   Q.    What was that?

12   A.    It was to only report reasonable hours.

13   Q.    Did you think that Wilma Yowell and

14 Julie Moran were working reasonable hours in 2011 and

15 2012?

16   A.    No.

17   Q.    Why do you say that?

18   A.    We were all working very unreasonable hours.

19 First of all, farming itself is an unreasonable hour

20 profession.  You never -- you're on call 24/7, like an

21 emergency room doctor, because you have animals or you

22 have plants or you have weather events.

23     So that's the one part of it, but we had a

24 mission to fulfill and we were not concerned about the

25 hours.  We were concerned about the mission.  We were

1  concerned about taking care of the farmers and helping

2  the farmers.

3          And so we were working very unreasonable

4  hours.  It was typical for us to be working 60-, 70-,

5  80-hour weeks.  What was reported was the best estimate

6  that I had of what reasonable hours would be.  So that's

7  why I capped it.

8      Q.   And he made the point that the amount in --

9  that you sought in reimbursement exceeded the amount

10  that was apparently requested by Wilma Yowell?

11      A.   That's correct.

12      Q.   And your explanation was -- is?

13      A.   Well, her invoices were incorrect.  What she

14  gave me I didn't ask for and it was just her base pay.

15  It was not commissions that she may have seen in two

16  months or in a year and a half.  It was the fair market

17  value of what she should have earned in that role as the

18  nonprofit development director.

19      Q.   This is somewhat out of my league, but this

20  is -- was this performance-based -- was she to be paid

21  on something called performance basis or performance --

22          MR. AFRAME:  Objection; leading.

23          MR. LANGE:  Yeah.

24      Q.   Explain how you understood she was to be

25  compensated?

1    A.    She was to be compensated on a base pay of

2    $2,000 a month, which she deferred, and then, as the

3    value of partnerships and strategic alliances and actual

4    dollar donations came in the door, we would track that

5    over time.  And even if she left -- even if she worked

6    with us in 2015, let's just say, and a big account came

7    in like Stonyfield Yogurt, then she would still be paid

8    for the work that she did in 2012 or 2011 to open that

9    account.

10    Q.    So the timing was not necessarily -- wasn't

11    necessarily going to be paid exactly the month that you

12    ended the service?

13    A.    That's right.

14    Q.    And you took that into account, didn't you?

15    A.    I did take that into account, having been a

16    performance-based compensation worker myself.

17    Q.    Now I can ask the question because it won't be

18    leading.

19          What is performance-based compensation?

20    A.    Performance-based compensation is based on the

21    work that you do that produces results.  It can be a

22    combination of -- some of you may know this already --

23    of base, just to make sure that you have a steady

24    income month to month, or it can be completely

25    commission-based, where you -- as we say in the

1   business, you eat what you kill kind of a thing.  I

2   mean, it sounds awful, but it -- whatever you earn in

3   terms of deals that come in and the -- and the dollar

4   value of those, that's what you put in your pocket, a

5   percentage of that, whatever that is.

6       Q.   You did some calculations, I'm not going to

7   get into it in detail, but what sort of calculations

8   were you doing last night based upon what the prosecutor

9   asked yesterday afternoon?

10      A.   I wanted to make sure that I was being

11  accurate in my recollection of what Wilma Yowell was

12  valued in the marketplace.  And I also tallied up her

13  numbers because I wanted to make sure that I had exactly

14  what we had put in for her because that spreadsheet that

15  I believe Ms. Redmond did didn't accurately reflect what

16  she actually asked for from USDA.

17           So that's what I did.  I have it in front of

18  me.  And it fell well within the fair range of what she

19  should have earned and the work that she expended as a

20  development director for a nonprofit.

21      Q.   Let me get to a point that's been raised by

22  myself, been raised by the government, and I'm certain

23  it's going to be a concern of the jury.

24           Wilma Yowell got some gas reimbursement, some

25  produce, but she never got paid?

1      A.    That's right.

2      Q.    And, Julie Moran, I understand they deferred

3  payment, but they -- Julie Moran never got paid?

4      A.    That's right.

5      Q.    And can you explain, if you can, why that

6  happened?

7      A.    Up until the point where the defamation and

8  the damage to the institute happened, I was a hundred

9  percent dedicated to making sure that these women got

10  their pay and I was working as hard as I could to make

11  sure that everyone got paid; first the farmers, then the

12  people who worked so hard for this project, and then

13  myself eventually.  And I had already put money into the

14  institute in 2009 and 2010.  So what I wanted to make

15  sure was that they got paid.

16          As soon as they went out together and stripped

17  the institute of any prospects of funding, as soon as

18  they went out and defamed me, as soon as they went to

19  the Coos County prosecutor and told him that I had

20  written a bad check and I spent a year under indictment

21  and I had to sit in a trial in a state court, until that

22  point, I was dedicated to paying those women.  But as

23  soon as that happened and they left me with a farm full

24  of animals and an institute that was in shambles and its

25  reputation and my personal reputation, which was stellar

1     up to that point, that is when they ceased to be

2     eligible for payment as I saw it, a counterclaim.

3         Q.    The money that you got month by month from

4     USDA, that goes into the Northway account?

5         A.    That's right.

6         Q.    And the evidence is that portions of that were

7     used for the Saco River Motor Lodge?

8         A.    That's right.

9         Q.    Did you give any thought to using RBEG money

10    to support the Saco River Motor Lodge where you and your

11    partner and your child were living?

12        A.    That's right, I did.  I gave a lot of thought

13    to it.

14        Q.    And how did that come out?

15        A.    The entire rent was in excess of $10,000.

16    What I claimed for the institute was -- I think it came

17    out to 3,000-something dollars.  And that was for the

18    use of the living space as a growing facility and also

19    for my office space through that year, until we found

20    the farm that had all the infrastructure that we could

21    move to.  So I took that into careful consideration.

22    And the IRS allows workers to take a deduction or to

23    deduct that from their business expenses.

24            So, basically, I would have paid that money

25    and so I felt entitled for us as an institute to have

1  that come out of the institute's account.

2       Q.    The jury's already heard how the Saco River

3  Motor Lodge space was being used for seedlings and not

4  just an office.

5       A.    That's right.

6       Q.    How about the other farm, the Steele Farm in

7  Wonalancet?  Did some of the rent for that farm come out

8  of the Northway account?

9       A.    Yes, it did.

10      Q.    What, if anything, did that have to do with

11 working with farmers or for farmers in the North

12 Country?

13      A.    That was creating revenue for -- to support

14 the operations in that -- in that area in the North

15 Country.

16            Without an institute, there would be no way

17 for us to offer services.  Without these house crops

18 that I talked about, and that includes animal products,

19 there would be no way for us to support on a sustainable

20 basis moving forward, not having to ask the government

21 for a grant every year or not having to ask the farmers

22 for the deliveries to pay for that.  That was the whole

23 point was to create a sustainable organization, not one

24 that was constantly on the dole, as Ms. Moran's

25 organization is today with her farmers.  She still is

1    not paying herself and she is still --

2        Q.    Suzanne, it's okay --

3        A.    Okay.  Sorry.

4        Q.    -- just stay and answer the question.

5        A.    Sorry.

6        Q.    Don't apologize.  Just try to answer the

7    question.  I know you're -- take a deep breath.

8              Can we look at her letter?  I think it's

9    Government's 51.

10              The prosecutor asked you about that letter and

11    it indicates -- could you highlight this portion here?

12              So it says in the letter, does it not, that

13    the federal funds were accepted and then immediately

14    automatically returned to the institute to support their

15    mission?

16        A.    That's correct.

17        Q.    You said that to an agent of the United States

18    Department of Agriculture, right?

19        A.    I did.

20        Q.    Was that true?

21        A.    That was true.

22        Q.    Was that true -- was that true with respect to

23    the earlier grant?

24        A.    That was true.

25        Q.    What's your understanding now about whether

1    that was or was not in compliance with the grant?

2         A.   My understanding is that what I did was not in

3    compliance with the grant.

4         Q.   How about back then?  What was your

5    understanding?

6         A.    My understanding, prior to receiving

7    Mr. Robinson's letter of January 16th, 2012, was that I

8    was in compliance with the grant, but USDA basically

9    instructed me or told me that no matter what happened

10   with the institute that those grant funds were supposed

11   to go for those people's salaries come hell or high

12   water, whether the van broke down, whether we had a

13   storm, whatever.  Those women needed to get paid.  I

14   should have paid myself.  I was required to pay myself.

15   I had no choice in the matter.

16             So that's what I learned.  And, obviously, I

17   learned that I made a mistake.  And I -- and the last

18   line of that letter asks Mr. Robinson to help me fix

19   that mistake.

20        Q.   How do you feel the USDA handled your case?

21             MR. AFRAME:  Objection; relevance.

22        Q.   You indicate in the letter that -- that

23   they -- you had applied for a grant and the grant had

24   not been awarded.  And how come -- you indicate in the

25   letter that -- why the grant wasn't awarded.  Why was

1    that?

2        A.    The $750,000 beginning farmer grant was not

3    awarded because USDA lost our application in the

4    electronic filing process.

5        Q.    What happened with the check, the first check

6    that you wrote to Julie Moran that ultimately resulted

7    in your being prosecuted and then later acquitted in

8    Coos County Superior Court?  Whose mistake was that?

9        A.    That was USDA's mistake.

10        Q.    The prosecutor asked you about Daimon Meeh and

11    the number of trips that he made to Coos County.  And I

12    think his testimony was it was a couple, two maybe.

13    Your understanding is different?

14        A.    My understanding is different.

15        Q.    How's that?

16        A.    Because when he submitted his expense reports,

17    his gas money -- he had submitted one in June, I

18    believe, for a hundred-something dollars and then he

19    submitted a final one for another 486 or something like

20    that.

21                So $500 in gas money when he was supposed to

22    be splitting his time between Carroll County and Coos

23    County and -- that didn't add up.  That would be at

24    least 20 trips to the North Country because he wasn't

25    asked to travel significantly to anywhere else.

1      Q.   Sarah Charles was a member of the board of the

2   institute?

3      A.   Yes.

4      Q.   Her testimony was I believe that she hadn't

5   attended meetings.

6      A.   That's correct.

7      Q.   Were there any meetings?

8      A.   There were board dinners, yes.

9      Q.   What did that have to do with the institute?

10     A.   The board dinners were a chance for us to get

11  all the board members together, sometimes we had other

12  farmers that would join us, and to talk about what was

13  going on with the institute.  And perhaps Ms. Charles

14  doesn't remember that she attended those dinners, at

15  least two of them.

16          MR. LANGE:  Just a minute.

17          Thank you very much.

18          THE COURT:  Redirect -- I mean recross.  I'm

19  sorry.

20                   RECROSS-EXAMINATION

21  BY MR. AFRAME:

22     Q.   Can we see I-7 for a second?

23          So this e-mail was written September 9th,

24  2012, right?

25     A.   That's correct.

1        Q.    Three days before Ms. Moran leaves the

2    program?

3        A.    Correct.

4        Q.    At the bottom it says:  Would you kindly send

5    me the invoices you submitted on my behalf.

6        A.    That's right.

7        Q.    And you have testified you were submitting

8    invoices under her signature for -- since this thing

9    began in 2011 July?

10        A.    That's right.

11        Q.    And so as I understand it, you're telling us

12    this means that she had approved that all along?

13        A.    Right.

14        Q.    But all she's asking you here is to give you

15    what you had already done, whether authorized or not,

16    right?

17        A.    Right.

18        Q.    Okay.  So you just talked about Daimon Meeh.

19    And the reason -- let's go back to 10, where I was --

20    or, sorry, 7.  And go to the -- the last page of the

21    supporting memorandum.

22            And total hours expended in western Coos

23    County, Daimon Meeh was working for you, right?

24        A.    Yes.

25        Q.    And which job was his?

1      A.   Director of farm operations and education.

2      Q.   And so you put down that he did -- and western

3  Coos County is important right because that is the scope

4  of the grant --

5      A.   That is correct.

6      Q.   -- that is the --

7      A.   Uh-huh.

8      Q.   And so you wanted to tell USDA that that's

9  where the work was done, right?

10     A.   Correct.  In or for western Coos County.

11     Q.   And --

12     A.   It's not worded clearly total hours expended

13  in western Coos County service area.  I didn't mean that

14  he was physically located there.  I meant that that was

15  the work that was done in or for --

16     Q.   Ah.

17     A.   -- western Coos County.

18     Q.   Okay.

19     A.   So that is my error in that sentence.

20     Q.   But your -- your testimony was that as you

21  understood it, Daimon Meeh had made multiple trips to

22  western Coos County, based on his gas receipts?

23     A.   Yes --

24     Q.   Yeah.

25     A.   -- his expenses, and also the information that

1    I had from him.

2        Q.    You -- he worked over in Carroll County,

3    right?

4        A.    He split his time between --

5        Q.    The West Side Road farm, Carroll County,

6    right?

7        A.    That was part of his responsibilities, yes.

8        Q.    Jackson, Thompson House Eatery Farm, Carroll

9    County, right?

10       A.    That's correct.

11       Q.    He testified that he came to your apartment at

12   the Saco River Motor Lodge multiple times.  Was that

13   true?

14       A.    That's true.

15       Q.    But you never asked him whether he was

16   traveling to western Coos County?

17       A.    Not true.

18       Q.    Well, you determined it based on a bunch of

19   gas receipts.

20       A.    And other data.  I used the gas receipts as

21   more concrete proof than anything else.

22       Q.    Did you ask him?

23       A.    Yes.

24       Q.    And he said, I've been to Coos County many

25   times?

1          A.    Yes.

2          Q.    And so when he testified here, he was just

3    wrong about that?

4          A.    He works for USDA.

5          Q.    Hmm.

6                So to USDA, Mr. Lange -- actually, Mr. Lange

7    didn't ask you, but you offered that USDA does not offer

8    training for how people should deal with these grants?

9          A.    That's right.

10          Q.    And you've agreed that you understood that the

11    grant was for you to pay people?

12          A.    That was the intention, yes, and I understood

13    that from --

14          Q.    But you didn't pay people?

15          A.    No, I didn't pay two people with other

16    mitigating circumstances.  I paid Mr. Meeh because he

17    was an employee.

18          Q.    But you did not pay the two contractors?

19          A.    I did not pay the two contractors and I did

20    not pay myself.

21          Q.    And so you needed training that you should pay

22    the people that you promised to pay?

23          A.    If I had understood the forms -- I thought I

24    was filling out the forms properly for the work that we

25    had done in the scope of work.  There was a

1  misunderstanding about whether those people had been

2  paid.  And I was never asked, has every single person

3  been paid every penny they're owed to date.  Had I been

4  asked that question.  I would have given an honest

5  answer.

6          Q.    People were paid no pennies to date, right?

7          A.    Well, that's not true.

8          Q.    Ms. Yowell and Ms. Moran were paid no pennies?

9          A.    That's not true.

10         Q.    Ms. Yowell was paid some groceries?

11         A.    And some expense money.

12         Q.    And Ms. Moran I think testified that on one

13 occasion she got some cash for gas money?

14         A.    That's correct.

15         Q.    Other -- but for their actual work, no dollars

16 were paid?

17         A.    That's correct.

18         Q.    Now, back to Government's 44, because, again,

19 I think you testified just now when Mr. Lange questioned

20 you that the way you came up with Ms. Yowell's value --

21 it's the third page of this, I think, that the -- the

22 way you came up with the value was to credit her for

23 donation work, development work, and what that was going

24 to bring to the institute, right?  That's how you --

25 that was a major factor in the numbers you reported to

1  USDA?

2      A.   Major factor in your mind or --

3      Q.   A factor.

4      A.   A factor?

5      Q.   A factor.

6      A.   That would be a factor.

7      Q.   Okay.  Then Wilma Yowell comes to you and

8  says, can you pay me something; and your response is, I

9  can't, because you haven't generated anything,

10  paraphrasing the second paragraph.

11      A.   Actually, no, let's not paraphrase that second

12  paragraph, please.

13      Q.   Does that second paragraph say:  My

14  understanding was that your compensation would be a draw

15  against future development funds which have not

16  materialized?

17      A.   Funds which have not materialized.

18      Q.   Okay.

19      A.   It's not the value of the work she did.

20      Q.   But that's what that says.

21      A.   That's what that says.

22      Q.   You didn't pay her?

23      A.   That's correct.

24      Q.   But you turned to USDA and said, reimburse me

25  for this number that factors in her development work and

1    all the money she was going to bring in?

2        A.    Reimburse me for the work that she did --

3    reimburse the institute for the work that she did,

4    expended, as per the scope of work reported in SF 270 to

5    the best of my knowledge and belief, Mr. Aframe.

6        Q.    Okay.  And -- okay.  So I think you testified

7    when Mr. Lange was just questioning you that

8    Ms. Redmond's charts are incorrect --

9        A.    That's correct.

10       Q.    -- in certain aspects?

11       A.    Yes.

12       Q.    And you made a statement to the jury that you

13   were dedicated to paying Wilma Yowell and Julie Moran up

14   until that moment that you, as you put it, decided that

15   you had a counterclaim --

16       A.    That's correct.

17       Q.    -- and then said, I'm not going to pay them.

18       A.    I couldn't pay it when they did what they did.

19   I had no ability to pay them.

20       Q.    Okay.  Go to 53e for one second.  53b.

21           So you testified yesterday that this -- when I

22   look at the next to last column of this chart that says

23   cash withdrawals and it says $41,530 --

24       A.    That's correct.

25       Q.    -- you testified yesterday that you took that

1  cash and decided to try to create some kind of livestock

2  program.  Do you remember that testimony?

3       A.   Decided to try is not what I said.

4       Q.   You created a livestock program.

5       A.   That's what I did.

6       Q.   And so that money, $41,530, came out in cash

7  for you to do something about livestock that you wanted

8  to do and thought, I guess, was in the institute's

9  interest.  That was your testimony?

10       A.   In the best interest of the institute's

11  sustainability, yes.

12       Q.   Okay.  And so even though that money was

13  available and was only a portion of what you got from

14  the USDA, you decided, I'm not going to pay the people

15  to whom I owe; I'm going to do this instead?

16       A.   The agreement with the contractors was that

17  they would defer their payment until such time as the

18  institute was in a stable financial position and I

19  believe I put that in the letter to Mr. Robinson.  That

20  was the agreement between the three of us.  Now, I know

21  that was a mistake, but that was the agreement between

22  the three of us.  So in order to make that investment

23  into the livestock, I had to continue to defer their

24  payments.

25            I was also recovering from the storm.  The

1  institute was in a very difficult financial position and

2  I was trying to navigate so that we could keep the doors

3  open so that we could help people.

4       Q.   And so my last question, I guess, is you say

5  that Anne Getchell told you to do the best you could and

6  to report the information that was needed and you told

7  us that you spent from 11:00 at night to 3:00 in the

8  morning trying to figure out how to make these

9  representations in the letters, in the forms --

10      A.   That's not what I said, Mr. Aframe.

11           THE COURT:  Well, I'm sorry.  I thought she

12  interrupted.

13           MR. AFRAME:  Well --

14           THE COURT:  Had you finished what you were

15  saying?

16           MR. AFRAME:  No.

17           THE WITNESS:  I'm sorry.

18      Q.   My understanding is you spent many hours,

19  you've testified, to determine what to put on those

20  SF 270s?

21      A.   That's correct.

22      Q.   And to make the supporting documentation?

23      A.   That's correct.

24      Q.   And you said you were really, really busy,

25  right?

1    A.    That's correct.

2    Q.    And you had to do this late at night?

3    A.    That's right.

4    Q.    And you had to pull together all these

5    different pieces of paper to figure -- or electronic

6    pieces of paper and real pieces of paper?

7    A.    Right.

8    Q.    But you never called them to say how much did

9    you work last month?

10    A.    Because they were not asked to track their

11    hours and I knew they were working in excess of 50, 60

12    hours a week.

13    Q.    So you just chose not to track -- ask them to

14    track their hours?

15    A.    Correct.

16    Q.    You chose to go through this process that

17    you've described?

18    A.    So that I would know exactly -- or not

19    exactly, but a best estimate that I could come up with.

20    Q.    And you used methodologies that allowed you

21    for at least some of these people to -- to seek

22    reimbursement from USDA for more than they were asking

23    from you?

24    A.    Ms. Yowell's invoice was not a representation

25    of what she was asking from us.

1        MR. AFRAME:  No further questions.

2        MR. LANGE:  Just one question.

3            CONTINUED REDIRECT EXAMINATION

4   BY MR. LANGE:

5    Q.   I'm not clear as to what you just told the

6   jury.

7    A.   Ms. Yowell's understanding of what she would

8   be earning with the institute was not $2,000 a month for

9   a woman with her capabilities, as hard as she worked and

10  the time that she worked.  That was not the agreement.

11       Her invoice was something that she put as an

12  interim step.  Her -- what she should have earned as a

13  nonprofit development director was $61,000 --

14       MR. AFRAME:  Objection.

15       THE COURT:  Yeah, sustained.

16       MR. LANGE:  Yeah, that's beyond the scope of

17  the question.  I just have one other question.

18       THE COURT:  The jury should disregard that

19  answer.

20   Q.   What -- to the best of your knowledge, what

21  was she doing for the institute after January of 2012 up

22  until April of 2012?  I'm talking about Wilma Yowell.

23   A.   Wilma Yowell?

24   Q.   Uh-huh.

25   A.   She was continuing the same kind of work that

1    she had performed before.

2        Q.    Specifically, do you have any recollection, as

3    you sit here now years later, of places or entities that

4    she was dealing with to advance the -- advance the

5    purposes of the grant?

6        A.    I do.

7        Q.    Go ahead.  Tell the jury.

8        A.    Okay.  Manchester Citizens Bank, Federal

9    Savings Bank, Republic Restaurant.  Let's see, what's

10   the other one?  There was the -- is it the Higgins

11   Hospital in Rochester?

12       Q.    Probably Huggins.

13       A.    Huggins; Popovers Restaurant in Portsmouth.

14   She was active with the Dover Chamber of Commerce.

15   Cotton Restaurant in Manchester.

16             Again, this is five years ago.

17             There were a few places in Keene that she had

18   talked to.  And she continued to check in and follow up

19   on the progress of those in the time after she pretty

20   much left us in March sometime.

21       Q.    How do you know that, that she continued to do

22   that?

23       A.    She did.

24       Q.    How do you know?

25       A.    She continued to communicate with me by

1    telephone.

2              MR. LANGE:  No more questions.

3              THE COURT:  Any further inquiry?

4              MR. AFRAME:  All set.

5              THE COURT:  All right.  You may step down.

6              THE WITNESS:  Thank you, sir.

7                   (Witness excused.)

8              MR. LANGE:  Your Honor, we rest.

9              THE COURT:  All right.  Why don't we excuse

10   the jury briefly and then we will move on to closing

11   arguments, summation.

12                   (Jury excused.)

13             THE COURT:  Please be seated, Counsel.

14             I'm working on one slight modification to the

15   jury instructions I want to run by you while we're all

16   sitting here.

17             You can be seated.

18             And then I know you probably have something

19   you want to say.  So just give me a moment.

20             All right.  Now, do you have a motion?

21             MR. LANGE:  I renew my motion under Rule 29 of

22   the Federal Rules of Criminal Procedure for an acquittal

23   on all 12 counts.  You've taken the motion that I filed

24   or that I made orally at the close of the government's

25   case and I renew the motion now.

1           THE COURT:  Is there anything else you want to
2  say about it?
3           MR. LANGE:  No.  Just briefly, I don't think
4  the government has met their burden of proof of the
5  requisite culpable mental state, particularly as the
6  jury charge is apparently going to be given.
7           THE COURT:  All right.
8           MR. AFRAME:  I think the government has met
9  its -- put in sufficient evidence that a reasonable jury
10  could find the defendant guilty.
11           I suppose Mr. Lange's talking about
12  willfulness.  We've shown multiple documents with
13  certifications that she signed, citing to 1001.  There's
14  another evidence as well, but that alone would be enough
15  to make it a jury question.
16           THE COURT:  All right.  The Court takes it
17  under advisement.
18           All right.  Let me -- we've already had our
19  sort of informal charge conference, we conducted most of
20  it by e-mail, but we reached a jury charge together with
21  respect to it, so I don't think there'll be any
22  objections by either side.
23           Based on the way the testimony came in the
24  last couple of days from the defendant, I wanted to
25  modify the nullification instruction just a little bit

1    and I want to -- so I want to run this by counsel here

2    now.

3            The current -- the current instruction that

4    everyone agreed to was, quote, you are not to be -- are

5    we on the record?

6            Oh, thank you.

7            "You are not to be concerned with the wisdom

8    of any rule of law as stated by the Court.  Regardless

9    of any opinion you may have as to what the law ought to

10   be, it would be a violation of your sworn duty to base a

11   verdict upon any other view of the law than that given

12   in the instructions of the Court, just as it would be a

13   violation of your sworn duty as judges of the facts to

14   base a verdict upon anything but the evidence in this

15   case."

16           Now, over the last couple of days, there's

17   been some fairly impassioned testimony from the

18   defendant about the NHIAF, its mission, the importance

19   of the mission to her and the community, that type of

20   evidence.  And I think that evidence was admissible

21   because it goes to the defendant's culpable mental

22   state, whether she willfully made false statements,

23   because it -- it at least potentially -- it

24   potentially -- it potentially goes to willfulness

25   because the defense in this case has been that rather

1    than willfully making false statements, what the

2    defendant did was make false statements out of a --

3    possibly a misplaced sense of devotion to the mission.

4           Now, the jury may or may not accept that.  I

5    do think, though, there's a risk, given that there was

6    some commentary about the importance of the mission,

7    that the jury could become a little distracted by that

8    to the extent that it -- it might focus on that to the

9    exclusion of the actual elements of the case and perhaps

10   be distracted or influenced by the importance, not --

11   actually, it could go either way.

12          It could go in the defendant's favor if they

13   were persuaded in a positive way about the sort of, you

14   know, normative favorablity of this public policy that

15   the grant pursued and that NHIAF pursued; or the other

16   way, it could -- I guess it's potentially if someone

17   viewed the grant as bad public policy or the NHIAF as on

18   a misguided mission, it could hold it against the

19   defendant.

20          I don't want them to be distracted by that one

21   way or the other, so I've modified the instruction a

22   little bit.  Here's how I'd like it to go.  I've just

23   added -- frankly, I've just added a couple of words to

24   the existing instruction.

25          You are not to be concerned -- "You are not to

1   be concerned with the wisdom of any rule of law as

2   stated by the Court, nor should you be concerned with

3   your opinion of the NHIAF, its work, or the federal

4   grant program involved.  Regardless of any opinion you

5   may have as to what the law ought to be or any opinion

6   regarding the NHIAF, its work, or the federal grant

7   program involved, it would be a violation of your sworn

8   duty to base your verdict upon any other view of the law

9   than that given in the instructions of the Court, just

10  as it would be a violation of your sworn duty as judges

11  of the facts to base a verdict upon anything but the

12  evidence in the case."

13          Now, that's the instruction I'd like to give.

14          You're still free to argue the evidence and

15  the testimony the defendant gave as it pertains to

16  willfulness, but I think you're not there and to go

17  further with it than that, I think, would violate

18  applicable law.

19          MR. LANGE:  I respectfully object.

20          THE COURT:  Okay.

21          MR. LANGE:  I think --

22          THE COURT:  Go ahead.

23          MR. LANGE:  I think the Court is getting into

24  the area of the jury.  It's up to them to determine

25  facts.  And when the Court starts to talk about

1    specifics opinion as to the institute, it's getting into

2    an area that -- that is really for the jury and not for

3    the Court.

4            And I -- I think that -- I'm not intending to

5    argue nullification.  My closing argument is going to be

6    focused on the elements of the event and whether or not

7    my client had a willful, culpable mental state.  I think

8    the Court is -- in this instance, the Court doesn't need

9    to go beyond what is already in the standard

10    instruction.

11            THE COURT:  What do you think?

12            MR. AFRAME:  Well, I mean, we filed the motion

13    in limine in the beginning because the concern that I

14    think this instruction goes to is the one which the

15    Court I think readily articulated is the one that we're

16    concerned about; that -- and, you know, I do think the

17    defendant said things along the way like, I made these

18    choices because I put the mission first.  It's right in

19    the letter that she wrote to David Robinson.  I made

20    this decision because the mission was paramount.

21    Well --

22            THE COURT:  That's permissible, putting the

23    mission -- possibly permissible as to willfulness, but

24    sharing in the mission by the jury is not a

25    permissible --

1              MR. AFRAME:  Correct.

2              THE COURT:  -- grounds --

3              MR. AFRAME:  And so I did not --

4              THE COURT:  -- to acquit or convict.

5              MR. AFRAME:  Sorry, your Honor.

6              I did not object to that evidence as it came

7       in, but I think we've talked about from the beginning it

8       does have a limited purpose.  And I think that's what

9       that instruction is trying to make clear.

10             THE COURT:  Yeah, it is.

11             But I want to -- I want to -- I don't want to

12      give Mr. Lange's argument short shrift.

13             I guess my question then is, Mr. Lange -- and

14      I think I would add the words opinion favorable or

15      unfavorable, I'd add that to my instruction.

16             But that said, I mean, Mr. Lange, what role --

17      what role should a juror's opinion, favorable or

18      unfavorable, regarding NHIAF, its work, or the federal

19      grant program involved have in determining guilt or

20      innocence in this case?

21             MR. LANGE:  It may not have any, but the

22      problem --

23             THE COURT:  So what's the harm of telling them

24      not to consider it?

25             MR. LANGE:  But the problem is that by

1    highlighting that particular aspect of the evidence, I

2    think you're getting into the province of the jury.

3              THE COURT:  But you just told me it wasn't the

4    province of the jury to -- if you don't think it's the

5    province of the jury, how can it be problematic to tell

6    them not to consider it?

7              MR. LANGE:  You're -- you're commenting on

8    particular portions of the evidence.  I don't think that

9    that's your proper function.

10             THE COURT:  All right.  I understand.

11             What did you want to say?

12             MR. AFRAME:  Well, I mean, I am not sure that

13   that's entirely accurate.

14             There are many, many cases that approve of

15   courts shaping the jury instructions to reflect what

16   actually happened in here because that makes sense to

17   the jury and that's a permissible thing for jury

18   instructions to do.  This is a very mild version of

19   that, but there's nothing wrong with that.

20             THE COURT:  Right.  And here's the real bottom

21   line.

22             There was a motion in limine here on

23   nullification evidence.  It wasn't affirmatively granted

24   or denied pretrial, but it was effectively denied.  The

25   evidence came in, in abundance.  And so I think this is

1   a way of making sure that that evidence is put in its

2   proper context.

3           So I -- I don't think there's a problem with

4   highlighting evidence.  This is not -- and I'm telling

5   you now, I'm giving -- I'm going to say opinions

6   favorable or unfavorable, I'm going to add that to my

7   proposal, and I'm going to give you latitude to argue

8   this evidence as to willfulness because the evidence

9   came in.  And for me to forbid you from, you know,

10  talking about it in your closings would be, I think,

11  ill-advised -- would be ill-advised and be probably a

12  mistake.

13          But I am going to give this -- some close

14  approximation of this instruction.  I think this will

15  be -- I'm going to put it on the record now and your

16  objection will be noted, Mr. Lange, on how I'm going to

17  give it.

18          "You are not to be concerned with the wisdom

19  of any rule of law stated by the Court, nor should you

20  be concerned with your opinion, favorable or

21  unfavorable, of the NHIAF, its work, or the federal

22  grant program involved.  Regardless of any opinion you

23  may have as to what the law ought to be or any opinion,

24  favorable or unfavorable, regarding the NHIAF, its work,

25  or the federal grant program involved, it would be a

1   violation of your sworn duty to base a verdict on any

2   other view of the law than that given in the

3   instructions of the Court, just as it would be a

4   violation of your sworn duty as judges of the facts to

5   base a verdict upon anything but the evidence in this

6   case."

7            And your objection, Mr. Lange, is noted.

8            Okay.  We'll take a break and we'll do

9   summation.

10           How long do you want, 15?  It's normal 15 --

11  it's the normal time anyway.

12           MR. LANGE:  For break?

13           THE COURT:  What?

14           MR. LANGE:  Break, 15 -- 10, 15 is fine.

15           THE COURT:  Yeah, 15.

16           MR. LANGE:  I thought you meant for the

17  closing, Judge.

18           THE CLERK:  If I may, there was an outstanding

19  exhibit, Exhibit B, with some proposed redactions.

20           THE COURT:  Yeah, the redactions to Exhibit B

21  I'm going to -- you know, I looked at them.  Frankly, I

22  think given the instruction I'm about to give, I think

23  it's permissible to just allow it and -- you just made a

24  motion.  Are you withdrawing the objection?

25           MR. AFRAME:  Sure.

1          THE COURT:  Objection withdrawn.  Okay.

2          THE CLERK:  Thank you.

3          THE COURT:  So Exhibit B.

4          Thank you, Charli, for remembering that.

5  We're in recess.

6     (Recess taken from 10:34 a.m. until 10:54 a.m.)

7          THE COURT:  All right.

8          Ladies and gentlemen of the jury, we are back

9  in the courtroom.  We're at the time of the case where

10 the attorneys for each side make closing arguments or

11 summations.

12         I just want to remind you what I told you in

13 the preliminary jury instructions that the closing

14 arguments are not evidence.  They are descriptions of

15 the evidence by the attorneys involved in an effort to

16 help you interpret the case as they want you to

17 interpret it, but the evidence is what you've heard.  It

18 is the testimony and the exhibits.  This is

19 argumentation.

20         Under the rules of procedure, the prosecution,

21 with the burden of proof, argues first.

22         Who will be closing.

23         MR. AFRAME:  I will.

24         THE COURT:  Are you prepared to go?

25         MR. AFRAME:  Yes.

1          THE COURT:  Please proceed.

2          MR. AFRAME:  Good morning.  So as you know,

3    Suzanne Brown is charged with 12 counts of making false

4    statements on certain government documents.  And you

5    also know that these government documents are the SF 270

6    forms that she submitted each and every month to obtain

7    reimbursements under two USDA grants that she received,

8    one in 2011 and one in 2012.

9          And in a few minutes the judge is going to

10   tell you what you need to find to conclude that she's

11   guilty on those 12 counts.  In the law we call them

12   elements.  They're things.  And here are the things that

13   you're going to have to decide.

14          You're going to have to decide whether

15   Ms. Brown made a false statement in each of those forms

16   in the supporting documents.  You're going to have to

17   decide whether she did that knowingly.  You're going to

18   have to decide whether she did that willfully.  And

19   you're going to have to decide whether those false

20   statements were material to a state -- to a decision

21   that a government actor made in the case.  And so those

22   are the elements or things that you're going to need to

23   decide.

24          So what I propose to do for you this morning

25   are three things:  One, go through each of those

1    elements and tell you the government's interpretation of

2    the evidence and how, in our view, it proves beyond a

3    reasonable doubt that each of those elements is

4    satisfied, one.

5              Two, I want to touch briefly on some of the

6    things that you heard the defendant testify to.

7              And, finally, I want to return back to why

8    this all happened.  What was the motive for all of this?

9              It was easy money.  It was to get the

10   taxpayers' easy money.

11             So let me start with the elements.

12             Did the defendant make these statements -- all

13   right.  Well, she made these statements, but were the

14   statements false.  That's the first thing that you need

15   to decide.

16             So you heard in detail about the two grants,

17   the 2011 grant and the 2012 grant, and you heard that

18   there was a promise to do certain work for farmers in

19   western Coos County.  And you heard that what the grant

20   was supposed to do was to pay the salaries of three

21   people to do that work.

22             So that was the promise.  It wasn't very

23   complicated.  Work to be done, three people are going to

24   do it, and the grants were reimbursable grants.  You

25   know what that word means.  That's a common word.

1    Reimbursement.  You lay it out, you then go and you get

2    it back.  That's that reimbursement means.  And this

3    grant was structured that way.  The institute was

4    responsible for 51 percent and the government, on a

5    reimbursement basis, was responsible for the other 49

6    percent.

7            So NHIAF was supposed to lay out the money,

8    turn to the government and say, now that we've laid it

9    out, please give us back 49 percent of that which we

10   have already laid out.

11           Those were the terms of the grant, both

12   grants.

13           And you know that 12 times under those grants,

14   month after month after month, Suzanne Brown submitted

15   the SF 270, the reimbursement form, the piece of paper

16   that you need to provide to the government to get the

17   reimbursement.

18           Well, what does the government want to know

19   when you're seeking reimbursement?  That you've paid the

20   monies out so that you are entitled to the 49 percent

21   back.  That's what the SF 270s were there to do.

22           And you know that she submitted those forms 12

23   times, signed the certifications 12 times, and 12 times

24   the government made reimbursement of 49 percent of the

25   monies that Suzanne Brown demanded.

1       And what else do you know?  You know from

2   Wilma Yowell's testimony, you know from Julie Moran's

3   testimony, but you also know from Suzanne Brown's

4   testimony these people were not paid.  They were not

5   paid.  Daimon Meeh was paid a small amount, he was paid

6   $10,000, but for the rest, Julie Moran, Wilma Yowell

7   were not paid.

8       And you know those invoices were not real.

9   Nobody submitted those hours.  Nobody was paid that rate

10  of pay.  Those signatures were put on those documents by

11  Suzanne Brown.  It said payment requested.  Go back and

12  look at them.  Keep your common sense.  They are --

13  those documents purport to say, government, this person,

14  Wilma Yowell, has demanded of NHIAF a certain amount,

15  now give us back 49 percent because, see, we paid her

16  that.  When we fill in total outlay, we paid her that,

17  so give us back the 49 percent.  And the government did.

18      But that was false.  That was false.  Those

19  were false statements.

20      You saw check stubs with FICA taken out and

21  social security -- social security tax taken out, income

22  tax taken out.  You saw all of that, right?  But there

23  were no checks.  False.  Suggesting to the government

24  that there were real checks that backed up these pay

25  stubs.  There weren't.  They were false.  The invoices

1    were false, the checks -- the check stubs were false.

2          We saw the summary charts.  There were no

3    checks to Wilma Yowell.  There was one bounced check to

4    Julie Moran.  It was lies.  Those statements were false.

5          Now, we've heard a couple different things

6    about why they weren't lies.  We've heard that they were

7    educated guesses made by the defendant, so they weren't

8    false, they were just guesses, that she used a whole

9    bunch of stuff that she had around her office late at

10    night to come up with these hours that she declared to

11    get the money under the grant.

12          But what do you know about that?  What did she

13    not do?  This master's of business administration -- I

14    read you her resume.  All sorts of jobs in business

15    community, a military career, all this stuff, and what

16    did she not do?  She didn't call the people who worked

17    for her and said, before I submit this invoice demanding

18    payment, how much should I ask to be paid?  She didn't

19    do that.  She made guesses.

20          She provided rates of pay that were entirely

21    false.  Julie Moran was paid on a project basis.

22    Wilma Yowell was paid on a monthly basis.  Daimon Meeh

23    was paid on a salary basis.  She says she wasn't paid at

24    all.  But yet on every piece of paper, $24 an hour rate

25    of pay times some made up number of hours to get a

1    bottom line that she liked because at the end of the

2    day, what was she able to do?  Get all the money.

3    False.  False.

4            Service areas.  This was supposed to take

5    place in western Coos County.  You heard Wilma Yowell

6    tell you she worked over in the seacoast.  You heard

7    Daimon Meeh say he'd been up there into western Coos

8    County twice during the time that he worked for NHIAF.

9    And I showed Ms. Brown a little while ago that document

10   where it says service done in western Coos County and

11   all of a sudden it's now in or for.

12           No.  The grant said western Coos County.  She

13   knew to write western Coos County.  That was false.

14   False.

15           Wilma Yowell coaches farmers.  You heard

16   Wilma Yowell.  You heard her background.  She's a

17   marketing professional who was interested in a cute

18   little farm over in the seacoast area called Tuttle Red

19   Barn, was concerned it was closing and asked how she

20   could help save this place where she liked to buy

21   groceries.  And when she got hooked up with Suzanne

22   Brown, Suzanne Brown realizes this woman has a marketing

23   background, so she sends her out to be the director of

24   development, one of the three positions for which she

25   can get reimbursement.

1          And then when she needs to submit the

2    invoices, all of a sudden -- because if you look at the

3    kinds of things that are supposed to be done in the

4    grant, helping farmers in western Coos County is one of

5    them -- all of a sudden, she's a farmer coach.  Lie.

6    Nothing makes that -- that's ridiculous.  So retain your

7    common sense.  The documents were filled with lies.

8          What's the other thing you've heard?  Well, it

9    was deferred compensation.  These were -- these were

10   true because I was going to pay her someday.  Look at

11   the documents.  Look at the check stubs.  Does a check

12   stub that talks about net pay with all the taxes taken

13   out, does that suggest to any reasonable person someday

14   this payment's going to be made or that check was

15   already written?  Invoices that say payment requested,

16   it's been a pleasure working with you, with a script

17   signature of Julie Moran, what's the logical import of

18   that document to the person who receives it in the USDA

19   office?

20         Julie Moran put in the payment request for

21   real money, real money was paid, now I'd like 49 percent

22   of it back from the government, as the grant allows.

23   That's what those documents say.

24         There's nothing in that grant that talks about

25   volunteerism, there's nothing in that grant that talks

1    about in-kind.  It talks about three salaries for three

2    people at a certain rate of pay.  And, lo and behold,

3    every single piece of paper, when added up, supports

4    dollar for dollar what she could get, she got.  False.

5    She wanted reimbursement and she had to make false

6    statements to get them and so she did.

7         Did she do that knowingly?  What does

8    knowingly mean?  Well, knowingly means that she did it

9    either with actual knowledge, you knew that it was

10   false, or you made a statement with a conscious purpose

11   of avoiding the truth.

12        I suggest to you that most of the evidence

13   here was of the actual knowledge kind, but when you

14   don't call people on the phone to ask them how long they

15   worked and you instead stay up from 11:00 at night to

16   3:00 in the morning fumbling through your -- looking

17   through all your papers to see how long they worked

18   instead of just asking them, that seems like not wanting

19   to know the truth, like how long did they really work.

20        But let me focus on the actual knowledge.  I

21   suggest to you that Suzanne Brown, from the very

22   beginning, went into this premised on lies.

23        Look at Government's Exhibit 1, the

24   application for the very first grant.  Look at the

25   signature and see what it says right above it.  I

1    certify that I got approval -- I'm paraphrasing, but I

2    got approval from my governing body for this grant.  I

3    asked, who was the governing body?  She said, the board

4    of directors.  This board of directors never met.  That

5    was false.

6         The very first piece of paper she signed,

7    Sarah Charles says, I have no idea about approving some

8    grant, there were no minutes, all there was was a bunch

9    of bylaws that Suzanne Brown had submitted to get her --

10   her organization certified so that it would be eligible

11   for a RBEG grant so she got the paperwork right -- I

12   think you'll learn from this case she's good at getting

13   the paperwork right -- but then when it came time to do

14   what she actually promised, not so much.  Not so much.

15        There's no evidence that that -- that the

16   board of directors approved this grant.  The very first

17   page, lies.

18        The second page, I've put aside $70,000 for

19   this grant project.  You heard Special Agent Redmond

20   testify; she had a negative balance in her account on

21   that day.  And on the day the grant actually issued, she

22   had $8.26 in her account.  She told the government what

23   they needed to hear so that she could get to the money.

24   From the very beginning of this whole thing, she was

25   telling lies.  And she did the same thing to get the

1    second grant, the same certification, the same promise

2    that all that money's there to pay her matching funds.

3    Not true.

4            So is it surprising that having told lies to

5    get the grant, her next thing is to submit 12 false

6    statements, each and every month, to actually get the

7    money.  I would suggest to you that it's not.  She knew

8    what she was doing from the beginning.

9            What else should you consider when you want to

10   decide whether she's engaged in this conduct knowingly?

11   I suggest to you consider the sophistication of the

12   false statement in the supporting documents.

13           This morning I went through an exercise where

14   I -- where we looked at Wilma Yowell and Julie Moran and

15   how every month the same numbers were put in for hours,

16   drawing down the money from the grant in equal

17   increments for each of the positions.  If that whole

18   thing about disbursements and text messages and e-mails

19   were true, I suggest to you you wouldn't think that

20   every month people would be working the exact same

21   amount.

22           But if you have a grant that's premised on

23   three positions, each one of them worth a certain

24   amount, then what you need to do if you want to draw

25   your grant down to zero is put in for the -- essentially

1   the same each number of times.  It's complicated to keep

2   that straight if it varies from month to month, but if

3   you're going to -- but if you just stay pretty much the

4   same every month, by the time you're done, you can do

5   what?  Get every single dollar out of that grant.  And

6   that's what she did.

7           How about Daimon Meeh's duplicate invoices?

8   That was kind of sophisticated, too.  She sent him a

9   real invoice to his house with a check that we saw with

10  his $40,000 salary.  But she knows that she has a grant

11  that says $24 an hour.  So she dummies one up, just make

12  it $24 an hour, send it into the USDA.  It's a few

13  dollars' difference.  It doesn't matter.  It made it

14  look right.  She knows that's what you got to do.  You

15  got to make it look right.  Just keep all the papers

16  straight and the money will come to you.

17          That was sophisticated.  She knew she had to

18  claim western Coos County.  This morning she says, oh,

19  it's a mistake; it was in or for.  But she wrote in.

20  Easy now to say it was a mistake.  She wrote in because

21  that mattered.  The service area of the grant was

22  western Coos County.  So she represented that's where

23  they did the work.  Gets you the money.

24          Look at Government's Exhibit 20.  That's an

25  e-mail.  We didn't focus too much on it, but in that

1    e-mail she says, can you give me the reimbursements

2    soon, I fronted the grant money to the people.

3            She knows, she knows, that you need to tell

4    USDA you're fronting the grant money because it's a

5    reimbursement grant.  She knows.

6            You know that she knows because when she

7    filled out the quarterly reports, she continues to carry

8    out the false statements when she says, what's the

9    recipient's share?  $23,500.  How much have we provided?

10   $23,500.  What do we still have to pay?  Nothing.  What

11   is she telling the government?  I've done my part; I've

12   paid them; I was entitled to reimbursement.  But she

13   told you here she didn't pay them.  She just told the

14   government what it needed to hear and knew not only to

15   keep the SF 270s straight, but also to keep all those

16   other documents straight, too.  She knew what she was

17   doing.

18           Don't overlook her background, either.  She

19   may be dishonest, but she is a smart woman.  She went to

20   the Naval Academy, she had a career in the Marines, she

21   has a master's of business administration from

22   Pepperdine University.  She was a professor at Southern

23   New Hampshire University, teaching small business.  And

24   she had a background in the software industry.  She knew

25   what she was doing.  She knows how to read a document.

1   She knows how to do business.  She certainly knows how

2   to call someone on the phone and ask them how much they

3   worked.  But she didn't do it because it was convenient

4   not to.  She knew what she was doing.

5            And, lastly, you should consider how she acts

6   when she's challenged on what she had done.  What does

7   she do?  She lashes out.  When David Robinson said --

8   questioned what she did with the money, she threatened

9   to tell the congressional delegation about her

10  dissatisfaction with the grant process.  When a farmer

11  who hasn't been paid dared to say to one of the

12  restaurants or other customers, I haven't been paid, she

13  threatens to throw him out of the program.  When

14  Julie Moran says, I have been cheated, she threatens her

15  with a defamation action.

16           Anyone who has a child should recognize this

17  behavior.  When you're caught in a lie, what do you do?

18  You try to blame someone else.  That's what she did.

19  Every time someone's on the trail, she blames them.  She

20  knew what she was doing.  And what else does she do?

21  She accuses everyone else of not telling the truth.

22  Another tactic when you know what you've done is false.

23           You heard her testimony here.  Julie Moran had

24  it wrong; Wilma Yowell had it wrong; Daimon Meeh had it

25  wrong; Kathy Redmond had it wrong; Sarah Charles had it

1   wrong.  Virtually everybody -- Anne Getchell, she really

2   had it wrong.  Everybody had it wrong.  The only person

3   who had it right was Suzanne Brown.  Really.

4          This is a sophisticated woman.  She went into

5   these grants on a fraudulent basis.  She knew exactly

6   what the 270s needed to look like and all the documents

7   that went with them and she did it.  She did it because

8   she wanted the money.  And that's the evidence that the

9   defendant knew what she was doing.

10          Did the defendant do it willfully?  That may

11  be a word you're not -- knowing, I assume you're

12  familiar with.  Willfully, maybe not so much.

13          The judge is going to tell you in a few

14  minutes that what willfully means here is that the

15  defendant, in a general sense, understood that her

16  conduct was unlawful when she engaged in it.  It's not

17  required that we prove the -- the government's not

18  required to prove the specific provision of law, but

19  that generally there was an understanding of the

20  defendant that this was unlawful.

21          So the first thing I would suggest when you

22  think about that, was it willful, is your common sense

23  and experience.  So as jurors, that's -- that's one of

24  the things you bring to the process, maybe one of the

25  most important things.  And I bet most of you file tax

1    returns every year.  When you do that, do you have a

2    sense that it would be unlawful to lie on that return to

3    receive a bigger refund?  You may not be able to tell me

4    the code section that makes that a crime, but do you

5    sense that that's wrong, that that's unlawful to do

6    that?  Don't forget your common sense when you think

7    about these elements.

8         But, in this case, there's more than that.

9    Suzanne Brown signed certifications and warnings over

10   and over again.  You saw on every single SF 270 that she

11   signed that form certifying she was telling the truth.

12        Look at Government's Exhibit 5, the obligation

13   of funds for the 2011 RBEG and the corresponding one for

14   the 2012 RBEG.  And her signature literally touches the

15   warning, if you go look at it.  In big capital letters

16   it says, whoever lies to the government, and it quotes

17   the statute that she's charged with here and her

18   signature literally touches the warning.

19        You've heard conflicting testimony about

20   Anne Getchell.  Anne Getchell testified she went over

21   these documents with her line by line.  The defendant

22   disputes that.  That's for you to decide.  But Anne

23   Getchell said that as a matter of practice, she goes

24   through with people what are the requirements and how do

25   you go about it and what are the rules of the road.

1          And we saw this sample that the defendant

2     produced.  I suggest to you that it doesn't -- that if

3     this were this kind of slapdash meaning that the

4     defendant testified to, having that kind of sample

5     SF 270 document, that's not really consistent with that.

6          But, in any event, Anne Getchell went over

7     this stuff with the defendant.  She signed in all these

8     places.  You saw where in the middle of a grant

9     agreement she's initialing certain sections.  I suggest

10    to you that means they went over that specifically and

11    in detail and wanted specific proof that they talked

12    about that.

13         The defendant knew this was wrong, knew this

14    was unlawful, and knew what she was doing.  It was

15    false, it was knowing, it was material -- it was

16    willful.

17         The last question is was it material.  Could

18    these decisions have influenced -- these representations

19    influenced a government decision?  Well, what did

20    Anne Getchell tell you about that?  If there had been no

21    outlays, if these invoices were false, if these check

22    stubs were not real, she testified that she wouldn't

23    approve the funds.

24         Of course that's true.  Why else would you do

25    that?  Why else would you submit all this phony stuff?

1    Tell Anne Getchell, we're doing good work over in Coos

2    County, we're helping farmers, we can't pay the people

3    right now, just give us the reimbursement.  Why not?  If

4    that was allowed, why not do that?  Well, that wasn't

5    allowed because the grant says to pay the people.  She

6    knew it; it mattered to Anne Getchell; that makes it

7    material because, otherwise, she wouldn't have got what

8    she really wanted.

9           So, ladies and gentlemen, there it is.  The

10   defendant made false statements on 12 SF 270s.  She did

11   it with knowledge, she did it willfully, and she knew --

12   and she did it knowingly, she did it willfully, and it

13   was material to the decision about whether to release

14   money to her.  That does make the defendant guilty on

15   all the counts that she's been charged.

16          So let me turn from those elements to talk for

17   a few minutes about some of the other things you heard.

18          When Ms. Graham gave her opening statement,

19   she ended by saying that this case, from the defendant's

20   perspective, was about hard work and good intentions.

21   So let's talk about that for a second.

22          Hard work.  Suzanne Brown testified that she

23   spent 60, 70 hours on NHIAF business.  She talked a lot

24   about how much work it was, but let's just dial it back

25   a minute and beyond sort of -- you know, we all can say

1    we worked really hard, we all like to say that, that's a

2    common thing to say, but let's really dial it back a

3    little bit and see what we've really learned about NHIAF

4    through this.

5            Well, we learned from Daimon Meeh that there

6    was a piece of property over in Conway on West Side

7    Drive and we learned that there was a piece -- a couple

8    acres behind a restaurant in Jackson on which there was

9    one farmer in -- on West Side Drive and one farmer up in

10   Jackson.  So she had two tenant farmers.  We know that.

11   We know that she grew seedlings in her hotel -- in her

12   apartment at the Saco River Motor Lodge.  We know that.

13   We know that she often says that she's writing a lot of

14   grants, but those don't seem to materialize from the

15   bank records for the most part except for these two USDA

16   grants.

17           She claims to have a Web site and we saw an

18   example of a Web site, there was a Web site, and she

19   says she put a lot of hours into that.  She testified

20   the other day that she made a Google doc.  Anyone who

21   knows what a Google doc is knows that that's a couple

22   minutes' worth of work.

23           She did convince Julie Moran to let NHIAF sort

24   of take over auspices of Julie Moran's project, but

25   Julie Moran did a lot of work on that project.

1          And, so, really, when you boil it all down,

2     what have you learned that NHIAF did that was so much

3     hard work?

4          You heard a lot from the defendant about

5     Tropical Storm Irene and that this was the major reason,

6     according to the letter that she wrote to Mr. Robinson,

7     that she couldn't -- she couldn't make her obligations

8     under the grant even though she knew she was supposed

9     to.

10         What have you really learned about that?  We

11    saw two exhibits, pictures of destroyed tomatoes.  Whose

12    tomatoes were those?  Those weren't even her tomatoes.

13    Those were Sean Kenney's tomatoes, the farmer who was

14    renting on her land.

15         Tropical Storm Irene caused a $50,000

16    loss that caused her to not be able to follow the

17    instructions of the grant and force her not to pay these

18    people, but to keep this money and take $41,000 out of

19    it in cash.  Tropical Storm Irene, somebody's tomatoes.

20         And she never told USDA about any of that when

21    it was really happening.  Instead of, I would suggest,

22    again, common sense, that when you're having a real

23    problem and David -- it's more than common sense because

24    David Robinson says, that's what the USDA is in the

25    business of doing, helping nonprofits and there are

1    problems in grants.  That happens.  And if you look at

2    the scope of work, it said, if you need to make a

3    change, you need to come to us.  She signed that a bunch

4    of times.  Did she go to them?  Nope.  She just

5    unilaterally decided to keep the money and do whatever

6    she wanted.  Again, your common sense.

7            Back to the tropical storm.  If you -- if

8    there's a flood in your basement, do you then turn to

9    your tax form and say, well, I only have two kids, but

10   I'll claim six and then if I claim six, I'll get a big

11   refund and then I can use all that money to fix whatever

12   problems I have because of the flood in my basement.  Of

13   course not.

14           But assuming that there were these losses from

15   Tropical Storm Irene, which -- which I suggest remains

16   unclear, just because you had this problem over here

17   with the farm in Conway doesn't mean you can tell

18   Wilma Yowell and Julie Moran, sorry, you don't get your

19   money, even though that's why the government gave you

20   the money in the first place.

21           There was hard work here.  The hard work was

22   keeping all these papers looking right and keeping

23   Julie Moran and Wilma Yowell off the track and trying to

24   convince them there really was no money.  But there was

25   money.  Right?  Because every month money was coming

1   into the account.

2          Look at Government's Exhibit 53e.  Every

3   single month, like clockwork, the government's

4   reimbursements coming in and it's going to something

5   else.  It's not going where it should be going.  That

6   takes hard work.  That takes hard work.  And she put a

7   lot of hard work into that aspect of NHIAF.

8          Good intentions?  What do we know about her

9   good intentions?  She lied to people so that she didn't

10  have to pay them.

11         Wilma Yowell, there are no actual dollars in

12  the door.  We looked at the chart.  On the day that

13  there was no actual dollars in the door, she had already

14  received 60-some-odd thousand dollars from the

15  government to pay for Wilma Yowell's services.  But

16  there's no actual dollars in the door.  She overbilled

17  the government for Wilma Yowell almost five times.

18         Wilma Yowell says, 9,500 is what I want.  She

19  doesn't pay her any of that, but turns to the government

20  and says, she's worth $42,000, based on some late night

21  math problem, I guess, some very sophisticated MBA

22  calculations, I guess.  And she submits that to the

23  government so she can get a $21,000 reimbursement

24  instead of the 4,000 reimbursement, which she would have

25  got if she had actually paid Wilma Yowell on the

1   invoices that Wilma Yowell submitted.  Good intentions.

2          And while that's all going on, this was just a

3   little bit of testimony, remember Ben Higgins, the

4   family friend's son who's the intern?  She's paying him

5   at the tune of $150 a week.  She pays Wilma Yowell and

6   Julie Moran essentially nothing, but she pays her

7   friend's son more money in one week than she paid them

8   the entire time.  Good intentions.

9          And when anyone challenges her repeated lying,

10  what does she do?  She threatens them.  Good intentions,

11  hardly; intentional lying, certainly.

12          So that brings us to the end.  Why?  Why do

13  all this?

14          So when you try a case, you hope that what

15  your colleague says in the beginning makes sense after

16  the evidence comes in and I get to talk to you at the

17  end.  And I suggest to you so it is here.

18          In the beginning, Ms. Konesky told you, lies

19  for easy money.  And I tell you now, why did she do it?

20  Why did she knowingly and willfully lie?  To get easy

21  money, the government's money.

22          Look at her bank account.  66 percent of the

23  money that came into her -- into her account from these

24  grants came from these grants.  Two-thirds of all the

25  money during this period that she ever took in came from

1   the USDA.  She took $41,000 of that money out in cash.

2   She told you yesterday it was for a livestock program.

3   There's no way to prove or disprove that, I suppose,

4   except that it's curious that when you look at what she

5   claimed to the USDA she was entitled to, look at

6   Government's Exhibit 53a, was $45,000, and in cash she

7   takes out $41,000.

8          And she pays her rent.  She told you that

9   yesterday; she paid her rent at the Saco River Motor

10  Lodge.  And if you wanted to spend your time going

11  through the bank records, you would see plenty of debit

12  card uses at Hannaford's and Home Depot and other stores

13  that you know she used the money.

14         What did she use it for?  She used it to make

15  ends meet.  It was easy money.  Sign a form every month,

16  dummy up some invoices, make up a -- make up a fake

17  check stub here and there from a template on your

18  computer, sign a couple forms, send it in, voila, 6- or

19  $7,000 right into your bank account.  It's pretty good.

20  It's easy money.

21         You know, at one point yesterday we heard an

22  interesting observation from the defendant.  She used

23  her bank account as one big pot of money.  She did what

24  she wanted when she wanted.  It was inconvenient to take

25  this money or half of this -- to take this money and pay

1    Wilma Yowell and Julie Moran, so she didn't.  She had

2    better ideas for the money.

3           Ladies and gentlemen, this was a government

4    grant.  What does that mean?  It's -- you don't have to

5    pay it back.  Use the money for the way we say and you

6    get to have it.  We don't want it back.  If you want to

7    increase your bank account so you can do what you want

8    with it, what do regular people do?  What do regular

9    businesses do?  They take a loan.  But what's the

10   problem with a loan?  One, you've got to pay interest,

11   but, two, you've got to pay it back.  Why pay it back

12   when all you got to do is make up some forms, submit

13   them to the government, and there's your free money.

14   Easy money.

15          So all she had to do to get the easy money was

16   just keep it all straight.  Just keep all the paperwork

17   looking right and tell the people -- take advantage of

18   the people.  Tell them, I really don't have the money,

19   when, in fact, look at the bank records, you know she

20   did.  She took advantage of people.

21          Look at Wilma Yowell.  Yowell demands payment

22   multiple times.  The defendant says, have no money.  To

23   quote her, there are no actual dollars in the door.  But

24   in the exact same month that she's telling her that, she

25   gets a check from the government that's worth almost

1  more than Wilma Yowell requested the whole time.  Pays
2  her nothing.

3       Julie Moran.  She knows Moran's heart and
4  passion are with the farmers.  It was Moran's project.
5  And if you don't pay the farmers, what's going to happen
6  to the project?  The farmers were kind of key to it.
7  It's going to be over.  So she knows if she says to
8  Moran, it's either you or the farmers, Moran's going to
9  pick the farmers every time and, of course, so she did.

10      It's manipulation.  It's manipulation, pure
11 and simple.  The defendant is a person who says what she
12 needs to say to get what she wants.  Cry poor to
13 Wilma Yowell and Julie Moran, so they'll go away.  They
14 won't bother me, I don't have to pay them.  At the same
15 time, turn to the USDA and say, I've already paid them.
16 And then the check comes and she can use it for whatever
17 she wants.  Easy money.

18      Suzanne Brown lied to the USDA with her
19 promises and she conned Wilma Yowell and Moran with
20 these alleged promises of deferred compensation, only to
21 decide at some point when it was no longer convenient to
22 deal with them that she had a counterclaim for which she
23 declared herself judge and jury and didn't pay them a
24 penny because she didn't want to.  Defendant knew she
25 was lying and she knew that it was wrong.

1          Ladies and gentlemen, you've heard a lot,

2    you've been here a bunch of days, but at the end of it

3    all, the case is pretty simple.  The defendant lied to

4    everyone -- her contractors, the government -- to get

5    money, easy money.

6          The lies to Yowell and Moran, those were wrong

7    and the defendant should be ashamed of those lies.  But

8    the lies to the USDA, those lies are crimes.  You should

9    hold the defendant responsible.  The defendant is guilty

10   on all 12 counts.

11         Thank you.

12         THE COURT:  Who's closing for the defense?

13         MR. LANGE:  I am.

14         THE COURT:  Are you prepared?

15         MR. LANGE:  Yup.

16         THE COURT:  Please proceed.

17         MR. LANGE:  Thank you.

18         Good morning.  So the case turns on this and

19   the other copies of the Standard Form 270, USDA Standard

20   Form 270.  This happens to be Defendant's Exhibit P.

21   This is the worksheet that Anne Getchell and my client

22   went over when they met in June of 2011 at the branch

23   office of the USDA branch office in Conway.

24         The government's position is that when my

25   client signed these documents and various documents

1    Exhibits 7 through 15, which are counts 1 through 9, and
2    when she signed Exhibits 27, 28 and 29 which are the
3    other three counts, 10, 11 and 12, that she was lying.
4    That's -- that's the -- that the document itself is a
5    lie and that the corroborating submissions she gave,
6    they're all lies.  They're not.
7              They make a lot out of the fact that Suzanne
8    has significant background, significant history, in
9    dealing with business.  She doesn't have significant
10   knowledge of grants before she goes into this.  She
11   reads the documents and she reads the language as she
12   understands them.  What's important here is not what
13   Anne Getchell thinks, not what David Robinson thinks,
14   not even what Suzanne thinks right now.  It's what she
15   understood at the time based on what she reviewed, given
16   her experiences and how she interpreted them.
17             And I submit when you look at all of the
18   evidence in this case, the government has not proven the
19   culpable mental state.  They have got to prove beyond a
20   reasonable doubt that what she did was knowing and what
21   she did was willful.  And I'll go over the definitions,
22   but don't take them from me; don't take them from him.
23   Take them from his Honor.
24             So she reads the form.  It's pretty clear that
25   if you look at the instructions on the back, what she

1    read -- I'm not going to put you through any more

2    sessions in front of the monitor.  You've seen it.

3    You're going to take these paper documents back.  You're

4    going to get the exhibits in electronic format as well.

5         You do what she did.  You read instruction

6    11a.  And what it talks about, it talks about how you're

7    supposed to prepare these portions of the form.  It's

8    line 11a and b and it talks about not just cash

9    admissions, but also outlays, also applies to basically

10   money owed.

11        Outlays are the sum of actual cash

12   disbursements for goods and services, the amount of

13   indirect services charged, the value of in-kind

14   contributions applied, and amount of cash advances and

15   payments made to subcontractors and recipients.

16        The certification -- read the certification.

17   Lord knows she did, very carefully.  This is what she

18   signed.  Her signature is across all the -- all 12 of

19   these requests for reimbursement.

20        I certify that to the best of my knowledge and

21   belief, the data on the reverse are correct and that all

22   outlays -- outlays, it doesn't say cash, it doesn't say

23   payments out.  It says outlays.

24        She's sophisticated.  She reads the 1941, she

25   reads these regulations, and she understands outlays not

1    just to be cash paid, but obligations incurred.  She

2    incurred obligations and she didn't pay those people.

3    No question about it.  But that does not mean that this

4    was false at the time she applied.  She -- people --

5    Wilma and -- Wilma Yowell and Julie Moran agreed to

6    defer their compensation.

7            How do you know that?  You can look at their

8    contract -- the contract, the agreement, even though I

9    don't think the Moran contract was signed.  They were

10   essentially month by month.  And you know from the

11   course of conduct that Julie Moran basically agreed to

12   defer her compensation.

13           In fact, there is an exhibit and I don't

14   remember the exhibit number, but there is a letter that

15   Julie Moran signs toward the end of this, in October --

16   in August of 2012 in which she says to the effect of we

17   have deferred our compensation; that is, Julie Moran and

18   my client, Suzanne Brown, have agreed not to accept

19   up-front payment.

20           Now, later on, it all goes south.  Clearly you

21   have observed my client.  She's clearly emotional.

22   She's clearly angry.  There were letters in there, I

23   think it's Defendant's Exhibit C, the letters back and

24   forth in September of 2012.  She -- that is, Suzanne --

25   feels she's been defamed.  Wilma and Julie get involved

1    in a bad check case, which is ultimately acquitted.  By

2    that time she's lost her reputation, which is important

3    in what she's doing.  She's angry.  No, she doesn't pay

4    the people.  Yes, she could have; yes, she should have.

5    That's not why you're here.  This is not a civil case

6    about money owed.  This is a case about whether my

7    client bears criminal culpability for making a knowing

8    and willful false statement to an agency of the

9    United States Government.

10             She puts in hours and rates of pay because

11   that's how she understands she's supposed to comply with

12   the form.  That's not the contract.  The contract, as

13   you know, with Yowell and with Meeh and also with Moran

14   were also -- with Meeh, it was a -- an annual salary;

15   with Yowell and -- it was performance-based.  She

16   explained to you what that means.  You heard that this

17   morning.  And with Julie Moran, it was basically month

18   by month.  It was task-based.

19             What my client did is she tried to monetize

20   something which is not easily monetized.  These are

21   people who were involved not in punching of a clock at

22   nine o'clock in the morning and punching out at 5:00.

23   These are people that were performing tasks.  And what

24   she's doing, she's monetizing the tasks as she agreed to

25   do in the grant as she understood it.

1          In the numbers in the invoices, particularly,

2    the after -- after the October submission, there are the

3    invoices.  These are -- those numbers reflect, as you

4    heard from Suzanne, a cap; her understanding of

5    reasonable hours for those tasks.  And that's what she

6    was -- that's what she was seeking reimbursement for.

7          The government says that Wilma Yowell and

8    Julie Moran did not authorize the invoices that Suzanne

9    submitted after October with regard to those other

10   SF 270 forms.  Suzanne told you otherwise.  Suzanne told

11   you that there was an understanding that she was going

12   to be submitting those invoices on behalf of Wilma and

13   Julie because that's how she was going to get reimbursed

14   for the purposes of the institute, for the purposes of

15   the grant as she understood it.  And, of course, to some

16   degree, she conflates -- that is, she mixes in -- the

17   goal of the grant, the scope of the grant, with what the

18   goal of the mission was -- I'm sorry, what the mission

19   of the institute was.  But the work gets done.

20          Now, you've got to decide credibility.  The

21   judge will give you instructions.  I submit that my

22   client was credible.  She laid out who she was.  If a

23   question had a yes or no answer, she gave a yes or no

24   answer and she explained herself.  I think she was

25   candid with you.  I think she was certainly candid

1    with -- it certainly appears she was candid with

2    David Robinson and Anne Getchell when they met in

3    January of 2013 and when she submitted the letter that

4    you'll see when you review the evidence.

5            She told them what she was doing with the

6    money.  She told them that $8,000 of the grant went

7    toward the farmers because that's what she understood

8    the point of all this was, to assist the farmers.

9            Saco River Motor Lodge.  Yes, that was where

10   Suzanne and her family were living part of the -- part

11   of 2011 and 2012, but that's also where she was working

12   out of; that's also where you know from Janis Conner and

13   from Daimon Meeh that she was -- had the seedlings, they

14   had grow lights, and she tells you and it's credible

15   that she allocated a portion of her rent payment toward

16   the Saco River Motor Lodge.

17           The -- with regard to the work getting done,

18   there is a letter from Julie Moran, it's Defendant's

19   Exhibit S, talks about what happened over the course of

20   2011.  And that was offered by my client after

21   Julie Moran offered it in support of the second grant.

22   And it describes what was done.  The point of the

23   taxpayers' funds, they were properly used, they were --

24   the mission was carried out.

25           There's a whole series of photographs about

1    what was going on with the institute in 2012.  Draw your

2    own conclusions.

3            The government says, oh, the hurricane was no

4    big deal, Irene was no big deal, it didn't make any

5    difference.  We've got a couple of photographs that

6    shows what was happening -- what happened after the Saco

7    River had flooded.  Well, it's important -- and there

8    were some tomatoes there -- what's important is some of

9    that is marketable.

10           What's important is she was counting on that

11   to keep the enterprise going.  And you can't sell

12   food -- you can't sell tomatoes, you can't sell food,

13   that's been tainted by floodwaters, and apparently from

14   what we heard from Daimon Meeh, that's part of what she

15   got into with Sean Kenney, who was a farmer out there at

16   the time.

17           The government suggests that Suzanne wasn't

18   doing very much; it was just all easy money.  That just

19   couldn't be further from the truth.  You've got clear

20   evidence that what she and Julie Moran and Wilma Yowell

21   were all working on -- and Meeh, as long as he was

22   working there -- came to fruition.  The number of

23   farmers who got involved increased; a distribution

24   system that started to go both ways, shrimp north, high

25   quality organic vegetables south, down here where we

1    have a bigger market.  That was all happening.  And it

2    was happening because Suzanne worked long and hard to

3    develop relationships with people like Bryant Alden and

4    with other potential vendors and also with the farmers.

5           The other thing is she put in a lot of time

6    which she didn't get reimbursed for to set up a Web site

7    which worked.  It was a way to assist the farmers to

8    market their products and a way for potential customers

9    to obtain fresh, organic produce.

10          $92,000, I believe that's the estimate on her

11   Web site, to set up a Web site, and it had a mobile app,

12   I gather.  She didn't bill for that.  That was services

13   that she put in to the institute, that was services that

14   advanced the cause of the -- of the grants as she

15   understood them, particularly the second grant.  The

16   second grant was set up to provide technical assistance.

17   And it's done.  Farmers are trained.  We know that from

18   Julie Moran.  A Web site is set up.  We have I think

19   it's Defendant's Exhibit N, which shows you the front

20   page of the Web site.

21          So what happens at the end?  Basically, the

22   e-mails from September of 2012 show a complete breakdown

23   in what was going on between Julie Moran, particularly,

24   and my client.  And my client is upset, outraged, that

25   Julie Moran made accusations which are not true.  The

1  e-mail that Julie Moran sent out to the other farmers,

2  those are her allegations.  That basically put the

3  kibosh on any kind of productive relationship that the

4  institute would have had with the farmers in Coos County

5  and the potential customers down in Carroll County and

6  down in southern New Hampshire.

7          What happens after that?  Well, the bad check

8  case.  Suzanne has to go to state criminal court and go

9  through that process.  And, yes, she's angry.  She's

10 acquitted, but she's angry and she's not going to pay

11 those people.  But, again, this is not about whether

12 those people should have been paid.  It's whether --

13 it's about whether at the time that my client submitted

14 those various SF 270s she knowingly, willfully, made a

15 material false statement.

16         Now, I don't have a lot more, but I want to

17 turn you to Friday.  Last Friday at noontime, I

18 understand that you people were given an option to stop

19 and go watch the inauguration of our new president.  And

20 you people elected not to do that.  And I think that

21 reflects very well on you.  I think it shows that you

22 people understand that this matters.

23         I don't know what the future holds.  We don't

24 know what the future holds in the life of this country,

25 but one thing that I hope does not change is that people

1    like yourselves continue to do what juries have been

2    doing first in England and now in the United States

3    since before this country was a country.  And that is

4    give people a fair and impartial trial, consider the

5    facts fairly, apply your common sense, and follow the

6    law as he gives it to you, the judge.

7            And what's essential to this case is that you

8    carefully consider part of the government's case.  I'm

9    not going to go over what the prosecutor's already been

10   over with you.  There are four elements, four parts of

11   the charge here, and -- material false statement,

12   knowingly, and willfully.  That's the essential part of

13   this case.

14           And I apologize, but because this is so very

15   important, I want to read to you what the definition of

16   willfully is as you're going to get it from the judge.

17   And, again, you don't take the law from me.  You take it

18   from the judge.

19           But this is what I understand the instruction

20   to be:  A false statement is made willfully if a

21   defendant committed the act voluntarily and purposely

22   and with knowledge that her conduct was in a general

23   sense unlawful.

24           I submit to you the government has not met its

25   burden to show that at the time she did these forms, my

1    client, that she knew it was unlawful.  And that's not

2    enough.  They've got to prove that she acted with a bad

3    purpose to disobey or disregard the law.  She did not.

4    Her purpose was to accomplish the ends of the grants as

5    she understood them at the time.

6              Based on all of the evidence in this case,

7    based on the law, based on the oath that you've taken, I

8    submit to you a proper verdict is not guilty on all 12

9    counts.

10             Thank you.

11             THE COURT:  Under our rules of procedure, the

12   prosecution, as the party bearing the burden of proof,

13   gets a brief rebuttal and it appears that Mr. Aframe

14   would like to do that.

15             So please do that, Mr. Aframe.

16             MR. AFRAME:  Thank you.  I'll be very brief.

17             Why did she do it?  She did it to get a big

18   pot of money.  She said it herself:  Get a big pot of

19   money, do whatever you want with it; promise you'll pay

20   people, that opens the key to the vault, the money comes

21   in, then tell the people that it's supposed to go to,

22   sorry, and do what you want with it.

23             This is not that complicated.  That's what it

24   is.  And the key is to lie to the government and then to

25   lie to the people and submit the paperwork.  That's what

1   this case is.

2           Now, you've heard conflicting things about

3   Suzanne Brown.  On the one hand, she's an

4   unsophisticated person who knows nothing about

5   government grants; on the other hand, you hear that she

6   came up with her approach by focusing on government

7   circular 1942-G and 11a instruction.  Doesn't seem to

8   work well, sort of being unsophisticated on the one

9   hand, but focusing on those documents on the other.

10          But what more do you know?  When she met with

11  David Robinson, and the whole purpose was to justify

12  what she had done, did she say anything to him about

13  instruction 11a or government circular 1942-G?  Nope.

14  It's convenient now, but when this was really going

15  down, did she say anything about any of that?  No.

16          And Mr. Lange said she was candid and

17  forthcoming with David Robinson when they met.

18  David Robinson had information about the 2012 grant,

19  that she had been doing all the things that we've tried

20  to prove to you that were not appropriate and I think

21  now she had the -- she has admitted they were not

22  appropriate.

23          At that time, did she say to Mr. Robinson, you

24  know, in the bigger grant, when I had more exposure --

25  because on the other grant, I got 60-some-odd thousand,

1    not just 18 -- did she -- was she honest, candid, and

2    forthcoming and said, you know, I did the same thing for

3    the other one?  No.  He didn't ask, so I didn't tell.

4    Tell people only what they need to know to get what you

5    want.

6              She thought maybe -- she probably thought

7    maybe she could squeak by on a $18,000 problem, but a

8    60-some-odd thousand dollar problem, that was a bigger

9    deal.  She wasn't going to bring that up.  She wasn't

10   candid or forthcoming.  She was manipulative.

11             Sean Kenney's tomatoes weren't hers.  I'm

12   not -- it is not clear where this $50,000 loss comes

13   from.  Those were not her produce.  She happened to find

14   a piece of land in a floodplain, so that guy's tomatoes

15   got destroyed, but it remains, I suggest to you,

16   entirely unclear what this huge loss that she has to

17   account for was.

18             But is it better to take $41,000 out in cash

19   or is it better to write checks to Wilma Yowell and

20   Julie Moran?  Well, if you do whatever you want, I guess

21   it's better to keep the money for yourself.

22             I associate myself with Mr. Lange's comments

23   about your role.  You have historically and will

24   continue to have an important role in our government to

25   use your common sense to sort out disputes.  And this is

1    a dispute and we've brought you here because of your

2    common sense.  Go use it.  And when you do, I think you

3    will conclude that Suzanne Brown lied to the government

4    knowingly and willfully to get money to do what she

5    wants.  It was easy money and she took it.  She's

6    guilty.

7              Thank you.

8              THE COURT:  Thank you, sir.

9              All right.  I'm going to give you a brief

10   recess here.

11             I'm just going to see where we are

12   procedurally.  I'm either going to give you lunch at

13   noon, we'll come back and you'll hear jury instructions

14   and you'll start deliberating, or I may give you the

15   instructions before lunch.  I just have to figure out

16   where we are.

17             So, Charli, let's give them a short break.

18                  (Jury excused.)

19             THE COURT:  Let's go off the record.

20                  (Off-the-record discussion.)

21             (Recess taken from 11:56 a.m. until

22   12:08 p.m.)

23             THE COURT:  All right, ladies and gentlemen.

24   As you can see, we've decided to give jury instructions

25   before you have your lunch.  This won't take too long,

1     but it will take a few minutes.

2              You each have a copy there now.  You can --

3     you can set it aside and listen to me, you can read

4     along with it.  I'm going to go pretty much verbatim,

5     although I may go off script a little bit when I think

6     it's necessary.  Or you're free to use it to jot notes

7     on.

8              Just do whatever makes you feel comfortable

9     right now.  There's no requirement one way or the other

10    about how to handle listening to these instructions as

11    long as you pay attention or are taking notes or

12    handling those at all.  But you get to keep those

13    instructions, those sets that you each have now, and

14    bring them with you into your deliberations.

15             So at this stage of the trial it's the duty of

16    the Court to instruct you on the principles of law that

17    you will apply in deciding this case.  It's your duty to

18    follow these instructions during your deliberations.

19    You should not single out any one instruction but apply

20    these instructions as a whole to the evidence in the

21    case.

22             The fact that the prosecution is brought in

23    the name in the United States of America entitles the

24    United States Attorney to no greater consideration than

25    that accorded to any other party in any litigation.  By

1   the same token, it is entitled to no less consideration.

2   All parties, whether government or individuals, stand as

3   equals at the bar of justice.

4           As jurors, you are the sole and exclusive

5   judges of the facts.  You must weigh the evidence that

6   has been presented impartially, without bias, without

7   prejudice, without sympathy.  You must make a

8   determination as to what the facts are, what the truth

9   is, based on the evidence presented in this case.  You

10  will decide the case by applying the law as it is given

11  to you in these instructions to the facts as you find

12  them to be from the evidence.

13          Now, your duty as a jury is to determine what

14  the facts are and what the truth is.  In doing that, it

15  will be necessary for you to assess the credibility of

16  each witness and determine what weight you will give to

17  each witness's testimony.  By credibility we mean the

18  believability or truthfulness of a witness.

19          You should carefully scrutinize all the

20  testimony given, the circumstances under which each

21  witness has testified, and every matter in evidence

22  which tends to show whether a witness is worthy of

23  belief or not worthy of belief.  For example:

24          Consider each witness's intelligence, motive,

25  state of mind, and demeanor and manner while testifying;

1          Consider each witness's ability to observe or

2    to know the matters about which the witness has

3    testified and whether the witness impresses you as

4    having an accurate recollection of those matters;

5          Consider whether the witness had any reason

6    for telling the truth or not telling the truth, whether

7    the witness had an interest in the outcome of the case,

8    or whether the witness had any friendship, relationship,

9    or animosity toward other individuals involved in the

10   case;

11         Consider the extent, if any, to which the

12   testimony of each witness was consistent or inconsistent

13   with itself or with the testimony of other witnesses;

14   and

15         Consider the extent, if any, to which the

16   testimony of each witness was either supported or

17   contradicted by other evidence in the case.

18         The testimony of a witness may be discredited

19   or, as we say in court, impeached, by showing that the

20   witness previously made statements which are different

21   from or inconsistent with his or her testimony here in

22   court.  Inconsistent or contradictory statements which

23   are made by a witness outside of court may be considered

24   only to discredit or impeach the credibility of the

25   witness and not to establish the truth of these earlier

1    out of court statements.  If a prior inconsistent

2    statement was made under oath in a deposition or an

3    interrogatory answer, however, it may be introduced not

4    only to impeach the credibility of the witness, but also

5    as substantive evidence of the truth of the statement.

6            You must decide what weight, if any, should be

7    given the testimony of a witness who has made prior

8    inconsistent or contradictory statements.  In making

9    this determination you may consider whether the witness

10   purposely made a false statement or whether it was an

11   innocent mistake; whether the inconsistency concerns an

12   important fact or whether it has to do with a small

13   detail; whether the witness had an explanation for the

14   inconsistency, and whether that explanation appealed to

15   your common sense.

16           In assessing the credibility of each witness,

17   both under direct and cross-examination, you will assign

18   each witness's testimony whatever weight you deem

19   proper.  You are not required to believe the testimony

20   of any witness simply because that witness testified

21   under oath.  You may believe or disbelieve all or part

22   of the testimony of any witness.  It is within your

23   province to determine what testimony is worthy of belief

24   and what testimony may not be worthy of belief.

25           During the course of trial, you also heard a

1  law enforcement agent testify.  You should consider the

2  testimony of a law enforcement agent in the same manner

3  as you would consider the testimony of any other witness

4  in the case.  In evaluating the credibility of a law

5  enforcement agent, you should use the same test which

6  you would apply to the testimony of other witnesses.  In

7  no event should you give the testimony of a law

8  enforcement agent any more credibility or less

9  credibility simply because of that witness's position.

10         Now, a particular item of evidence is

11  sometimes received for a limited purpose only.  If you

12  were instructed by the Court that evidence received only

13  for a limited -- was received only for a limited

14  purpose, you may use the evidence only for that limited

15  purpose, and not for any other purpose.

16         During the trial, I asked questions of one or

17  more of the witnesses who testified.  You should not

18  infer anything whatsoever from any questions that I

19  asked of the witnesses in this case.  Don't assume that

20  I hold any opinion regarding any part of this case.  You

21  are the sole judges of the facts in this case.

22         The weight of the evidence is not necessarily

23  determined by the number of witnesses testifying on

24  one or the other side of any issue.  You should not

25  consider -- strike that -- you should consider all the

1    facts and circumstances in evidence to determine which

2    of the witnesses are worthy of belief.  You may find

3    that the testimony of a small number of witnesses on a

4    particular issue is more credible than the testimony of

5    a greater number of witnesses on the other side of that

6    same issue.

7            In reviewing the evidence, you should consider

8    the quality of the evidence, not the quantity.  It is

9    not the number of witnesses or the quantity of testimony

10   that's important, but the quality of the evidence that

11   has been produced that is important.  You will consider

12   all the evidence, no matter which side produced or

13   elicited it, because there are no property rights in

14   witnesses or in the evidence that is presented.

15           The evidence in this case consists of the

16   sworn testimony of the witnesses, all the exhibits

17   received in evidence, and any stipulations the parties

18   have entered.  You will consider all the evidence no

19   matter which side produced it or elicited it because

20   neither side has an exclusive right to the testimony of

21   a particular witness or to the evidence that is

22   presented.

23           Now, there's two types of evidence that you

24   may properly use in deciding whether a defendant is

25   guilty or not guilty.

1              Direct evidence is the testimony given by a

2    witness about which that witness has seen -- about what

3    that witness has seen, has heard or has observed, or

4    what that witness knows based on personal knowledge.

5    Direct evidence also includes any exhibits that have

6    been introduced.  Evidence is any marked exhibits, the

7    ones that are with you in the jury deliberation room.

8    Those are the exhibits.  If there's paper or documents

9    that you saw during the trial that you don't see in the

10   jury deliberation room, that means it was not admitted

11   as an exhibit and you shouldn't consider it.

12             Now, evidence may also be used to prove a fact

13   by inference.  This is referred to as circumstantial

14   evidence.  In other words, from examining direct

15   evidence you may be able to draw certain inferences

16   which are reasonable and just identified in light of

17   your daily experience.  Such evidence constitutes

18   circumstantial evidence.

19             Let me tell you the difference now, because

20   that's sort of an ethereal definition.  But here's the

21   bottom line about direct and circumstantial.

22             First of all, you can consider them both

23   equally.  You assess the weight of the evidence.  It's

24   up to you.  You give it what weight you think it

25   deserves.

1          But if the juror seated in the back row there

2   opened that shade and looked out the window and saw it

3   raining outside, saw raindrops falling and puddles with

4   drops, he could tell you all, it's raining outside.

5   That's direct evidence because it's based on his

6   eyewitness testimony.

7          But if you saw a witness walk in or a person

8   walk in the courtroom with an umbrella, shaking off

9   water, shaking off a raincoat, that would be

10  circumstantial evidence of it raining outside because

11  you're not seeing the rain, you're just seeing

12  circumstantial evidence of the rain.

13          And you can give whatever weight to whatever

14  evidence you deem appropriate.  Don't worry about the

15  difference.

16          Circumstantial evidence may be given the same

17  weight by you as direct evidence.

18          Now, what's not evidence?

19          Certain things are not evidence and cannot be

20  considered by you as evidence.  Arguments and statements

21  by lawyers are not evidence.  What they have said in

22  their opening statements, closing arguments and at other

23  times is intended to help you interpret the evidence,

24  but it's not evidence.  If the facts as you remember

25  them differ from the way the lawyers have stated them,

1   your memory controls.  If the law as stated by the

2   lawyers differs from the law as stated by the Court, you

3   must take the law from the Court, from me.

4           You are not to be concerned with the wisdom of

5   any rule of law as stated by the Court.  Nor should you

6   be concerned with your opinion, favorable or

7   unfavorable, of the New Hampshire Institute of

8   Agriculture and Forestry, NHIAF, its work or the federal

9   grant program involved.  Regardless of any opinion that

10  you may have as to what the law ought to be or any

11  opinion, favorable or unfavorable, that you may have

12  regarding the NHIAF, its work, or the federal grant

13  program involved, it would be a violation of your sworn

14  duty to base a verdict upon any other view of the law

15  than that given to you in the instructions -- in the

16  instructions of the Court, just as it would be a

17  violation of your sworn duty, as judges of the facts, to

18  base a verdict upon anything but the evidence in the

19  case.

20          Questions and objections by lawyers are not

21  evidence unless the witness adopts the facts set forth

22  in the question.  Lawyers have a duty to their clients

23  to object when they believe a question is improper under

24  the rules of evidence.  You should not be influenced by

25  objections or by my ruling on objections.  It's the

1    responsibility of the Court to rule on objections and

2    this Court has not intended to indicate in any way by

3    its rulings or by what it has said what the verdict in

4    this case should be.  The Court in this case, as in all

5    cases, is completely neutral and impartial and leaves it

6    to you the jury to decide the case based on the facts as

7    you find them to be and the law as the Court will give

8    it to you.

9         Testimony that has been stricken or excluded,

10    or that you have been instructed to disregard, is not

11    evidence and must not be considered.  Anything you may

12    have seen or heard when the court was not in session is

13    not evidence.  You are to decide the case solely on the

14    evidence received at trial.

15         Now, the fact that an indictment is returned

16    against an individual is not evidence of that person's

17    guilt.  An indictment is merely a formal method of

18    accusing an individual of a crime in order to bring that

19    person to trial.  It is you the jury that will determine

20    whether the defendant is guilty or not guilty of the

21    offense charged based on a consideration of all the

22    evidence presented and the law applicable to the case.

23    Therefore, you must not consider the indictment in this

24    case as any evidence of the guilt of the defendant, nor

25    should you draw any inference from the fact that an

1   indictment has been returned against him.  Her.  Sorry.

2   Against her.

3           The defendant, although accused, begins a

4   trial with a clean slate -- with no evidence against

5   her.  The law permits nothing but legal evidence

6   presented before the jury to be considered in support of

7   any charge against a defendant.

8           The law presumes every defendant to be

9   innocent until proven guilty beyond a reasonable doubt.

10  The burden of proving a defendant guilty rests entirely

11  on the United States Attorney.  The defendant does not

12  have to prove her innocence.  The defendant enters the

13  courtroom and is presumed to be innocent until the

14  United States Attorney convinces you beyond a reasonable

15  doubt that she is guilty of every essential element of

16  the offense charged.

17          Now, the presumption of innocence alone is

18  sufficient to acquit a defendant unless the jury is

19  satisfied beyond a reasonable doubt that the defendant

20  is guilty after a careful and impartial consideration of

21  all the evidence in the case.

22          The burden is always on the United States

23  Attorney to prove guilty beyond a reasonable doubt.

24  This burden never shifts to a defendant.  The law does

25  not impose upon a defendant in a criminal case the

1    burden or duty of calling any witnesses or producing any

2    evidence.

3            If the jury, after careful and impartial

4    consideration of all the evidence in this case, has a

5    reasonable doubt that the defendant is guilty of the

6    charge set forth in the indictment, it must find the

7    defendant not guilty.

8            The jury must never find the defendant guilty

9    based on a mere suspicion, conjecture, or a guess.

10   Rather, the jury must decide the case on the evidence

11   that is before you and the reasonable inferences that

12   can be drawn from that evidence.

13           Now, you are not to give any consideration to

14   potential punishments or sentences in deciding this

15   case.  The punishment provided by law for the offense

16   charged in the indictment is a matter exclusively within

17   the province of the Court and should never be considered

18   by the jury in any way in arriving at an impartial

19   verdict.  You must decide this case based on the

20   evidence you have seen and heard and on the law as the

21   Court gives it to you, and not on any punishment you

22   believe the defendant might receive or could receive.

23           Now, the indictment charges the defendant,

24   Suzanne Brown, with 12 counts of making a material false

25   statement to a federal agency, in violation of federal

1    law.

2           The indictment charges that in 2011 and 2012

3    in the District of New Hampshire, the defendant,

4    Suzanne Brown, did willfully and knowingly make

5    materially false, fictitious, and fraudulent statements

6    and representations in a matter within the jurisdiction

7    of a department or agency of the United States by

8    representing to the U.S. Department of Agriculture in a

9    Standard Form 270 Request for Advance or Reimbursement

10   form and appended supporting documentation, that the

11   New Hampshire Institute of Agriculture and Forestry --

12   the NHIAF, of which Brown was the executive director --

13   had paid several thousand dollars to NHIAF employees for

14   services rendered as grounds to draw down funds from a

15   previously approved USDA Rural Business Enterprise,

16   RBEG, grant.

17           Counts 4 through 12 of the indictment further

18   charge that, in support of her representations in nine

19   of these Requests for Advance or Reimbursement forms,

20   Brown appended to the Standard Form 270 -- and submitted

21   to the USDA -- invoices purportedly prepared by one or

22   more NHIAF employees outlining the services they had

23   performed and the money that they owed -- the money they

24   were owed and had been paid by NHIAF, according to Brown

25   in the Standard Form 270 Request for Advance or

1  Reimbursement.

2          The indictment further charges, as to all

3  counts, that the statements and representations made by

4  Brown were false, because as Brown then and there knew,

5  the New Hampshire Institute of Agriculture and Forestry

6  had not, in fact, made any such payments to its

7  employees for the services rendered; and that such

8  representations violated federal law.

9          A matter is within the jurisdiction of a

10  federal agency if the federal agency has the power to

11  exercise authority in that matter.  I am instructing you

12  now as a matter of law that the statement alleged in the

13  indictment pertains to an activity within the

14  jurisdiction of a federal agency, specifically, the

15  U.S. Department of Agriculture.

16          Section 1001 Title 18 of the U.S. Code

17  provides, in pertinent part, that:

18          Whoever, in any manner within the jurisdiction

19  of the executive, legislative, or judicial branch of the

20  government of the United States knowingly and willfully,

21  one, falsifies, conceals, or covers up by any trick,

22  scheme, or device of material -- or device a material

23  fact; two, makes a materially false, fictitious, or

24  fraudulent statement or representation; or, three, makes

25  or uses any false writing or document knowing the same

1  to contain any material false, fictitious, or fraudulent

2  statement or entry is guilty of an offense against the

3  United States.

4          In order to sustain its burden of proof of a

5  crime of making a false statement to a department of the

6  United States as charged in the indictment, the

7  government must prove the following elements beyond a

8  reasonable doubt:

9          First, that the defendant made a materially

10  false statement;

11          Second, that the defendant made the false

12  statement knowingly and willfully;

13          Third, that the defendant made the false

14  statement to the U.S. Department of Agriculture upon a

15  Request for Advance or Reimbursement.

16          I will now define some of the terms I just

17  used.

18          False.  A statement is false if it was untrue

19  when made.

20          Material.  A false statement is material so

21  long as the statement in question had a natural tendency

22  to influence, or was capable of influencing a government

23  function.  Thus, if a statement could have provoked

24  government action it's material, regardless of whether

25  the agency actually relied upon it.

1          Knowingly.  A false statement is made

2     knowingly if the defendant had actual knowledge of its

3     falsity or acted with reckless disregard of the truth,

4     with a conscious purpose to avoid learning the truth.

5          Willfully.  A false statement is made

6     willfully if the defendant committed the act voluntarily

7     and purposely, with the knowledge that her conduct was,

8     in a general sense, unlawful.  That is, the defendant

9     must have acted with a bad purpose to disobey or

10    disregard the law.  The government need not prove that

11    the defendant was aware of the specific provision of the

12    law that she is charged with violating or any other

13    specific provision.

14         The indictment charges that the offense was

15    committed on or about a certain date.  Different counts

16    allege different dates.  Although it is necessary for

17    the government to prove beyond a reasonable doubt that

18    the defendant committed the offenses on the dates or

19    reasonably near the dates alleged in the indictment, it

20    is not necessary for the government to prove that the

21    offense was committed on precisely the date charged.

22         In the verdict form, you'll be asked to

23    indicate whether you find the defendant guilty or not

24    guilty of the offenses charged in the indictment.

25    Remember that you may not find the defendant guilty

1    unless you unanimously find that the United States

2    Attorney has proven beyond a reasonable doubt each

3    element of the crime.

4          Now, back to some reminders about note-taking.

5    You were permitted to take notes during this trial and I

6    want to remind you of the instructions I gave you about

7    your notes.  Do not use your notes as authority to

8    persuade other jurors.  Your notes should be used only

9    as aids to your own memory and must not be used as

10    authority to persuade the other jurors of what the

11    evidence was during the trial.  You might have made an

12    error or a mistake in recording what you have seen or

13    heard.  In the end, each juror must rely on his or her

14    own recollection or own impression as to what the

15    evidence was.  Your notes are not official transcripts

16    of the testimony.

17          Now, you'll be able to view the documentary

18    exhibits in this case through an electronic system

19    called JERS, J-E-R-S.  J-E-R-S stands for the Jury

20    Evidence Recording System.  In your deliberation room,

21    there's a plasma TV.  You'll be able to view the

22    exhibits from that plasma television screen.  It's

23    operated by touch and the courtroom deputy will show you

24    a brief tutorial.  Very easy to operate.

25          You should understand that you will also have

1    all documentary exhibits in paper copy to examine as

2    well.  The JERS system is simply another way for you to

3    view the exhibits.  The advantage is that you can all

4    see the exhibit on the screen and discuss that exhibit

5    while seeing it displayed on the screen.  You may

6    consider any and all exhibits in the JERS system.

7             It is easy to use, especially after you've

8    seen the tutorial.  But if you have a question about

9    JERS, as with any other question you might have, you may

10   have, you must put it in writing.  Any question that you

11   have for the Court, you've got to put in writing.  So we

12   have a record.

13            Even if you need some sort of technical

14   assistance with JERS, you'll need to put your request in

15   writing so that the court security officer can present

16   it to me.  It doesn't mean you have to describe the

17   problem in detail if you have a problem; just say, we're

18   having a problem with JERS.

19            Before resolving any of your questions, I will

20   show your written question to the lawyers.

21            Now, let me tell you something else about jury

22   questions.  Jurors sometimes ask questions.  I'm not

23   encouraging you to do it or discouraging you from doing

24   it.  Sometimes there's a disagreement, people can't

25   understand something and they want to ask the Court.

1    And if you -- if you need to do that, the way to do it

2    is to write the question on a piece of paper and have

3    the foreperson of the jury or somebody on the jury sign

4    it and then give it to the court security officer.

5              Now, one question that jurors tend to ask a

6    lot, and I'll give you the answer ahead of time so you

7    don't have to bother asking, no, I can't give you the

8    transcript of the testimony.  Sometimes jurors want the

9    transcript or they want one witness's testimony or just

10   one question and answer.  We can't give you that.  It

11   takes longer to prepare the transcript of a trial than

12   the day it's transcribed.  So I won't be able to give

13   you a transcript.  You're going to have to go on your

14   recollection of the testimony in the case.

15             Now, the principles set forth in these

16   instructions are intended to guide you in reaching a

17   fair and just result in this case, which is important to

18   the parties.  You are to exercise your judgment and

19   common sense without prejudice, without sympathy, but

20   with honesty and understanding.

21             You should be conscientious in your

22   determination of a just result in this case because that

23   is your highest duty as officers of this court.

24   Remember also that the question before you can never be

25   will the government win or lose this case.  The

1  government always wins when justice is done regardless

2  of whether the verdict be guilty or not guilty.

3          When you have considered and weighed all the

4  evidence, you must make one of the following findings

5  with respect to each crime charged, each count:

6          If you have a reasonable doubt as to whether

7  the United States Attorney has proved any one or more of

8  the elements of the crime charged, including the

9  identity of the defendant as the perpetrator of the

10  crime, it is your duty to find the defendant not guilty.

11          If you find that the United States Attorney

12  has proved all the elements of the crime charged beyond

13  a reasonable doubt, including the identity of the

14  defendant as the perpetrator of the crime, then you may

15  find the defendant guilty.

16          As I explained before, the punishment provided

17  by law for the offense charged in the indictment is a

18  matter exclusively within the province of the Court and

19  should never be considered by the jury in any way in

20  arriving at an impartial verdict.

21          When you retire, you should elect one member

22  of the jury as your foreperson.  That individual will

23  act very much like the chairman person of a committee,

24  sort of the first among equals, just seeing to it that

25  the deliberations are conducted in an orderly fashion

1    and that each juror has a full and fair opportunity to

2    express his or her views, prohibitions, I'm sorry --

3    positions and arguments on the evidence and the law.  Of

4    course, the foreperson's vote doesn't count for any more

5    or less than anybody else's.

6            It is your duty as jurors to consult with one

7    another and to reach an agreement, if you can do so

8    without violence to your individual judgment.  Each of

9    you must decide the case for yourself, but do so only

10   after impartial consideration of the evidence in this

11   case with the other jurors.

12           In the course of your deliberations, do not

13   hesitate to reexamine your own views and change your

14   opinion if convinced it is erroneous.  But do not

15   surrender your honest conviction as to the weight or

16   effect of the evidence solely because of the opinion of

17   the other jurors or merely for the purpose of returning

18   a verdict.  You should also take as much time for

19   deliberations in this case as you consider to be

20   necessary and appropriate.

21           Remember at all times that you are not

22   partisans.  You are judges.  You are the judges, judges

23   of the facts.  Your sole interest is to seek the truth

24   from the evidence in the case.

25           If during your deliberations it becomes

1  necessary to communicate with the Court, you may do so

2  only in writing signed by the foreperson or by one or

3  more members of the jury.  Give that note to the court

4  security officer.  It'll be brought to my attention.  No

5  member of the jury should ever attempt to communicate

6  with the Court except by a signed writing, and the Court

7  will communicate with the jury on anything concerning

8  the case either in writing, by sending a note back, or

9  orally in the courtroom.

10          Remember that you are not to tell anyone,

11  including the Court, how the jury stands, numerically or

12  otherwise, on the matters you are deciding, until after

13  you have reached a unanimous verdict or have been

14  discharged.

15          Nothing said in these instructions is intended

16  to suggest or to convey in any way what your verdict

17  should be.  The verdict is the sole and exclusive duty

18  and responsibility of the jury.

19          When you have completed the verdict form

20  according to these instructions and the instructions on

21  the form, you will have concluded your deliberations and

22  arrived at a verdict.  At that point the foreperson

23  should sign and date the verdict form and then notify

24  the court security officer and you'll be returned to the

25  courtroom.

1          Okay.  A couple housekeeping matters now.  Now

2    that the case is yours, you'll be staying here for

3    lunch.  Lunch is on us.  We provide lunch during jury

4    deliberations and we've ordered that for you.

5          Right?

6          THE CLERK:  Yes, Judge.  It's here.

7          THE COURT:  So it's here and it's 12:30.  You

8    may want to have lunch before you get started.  But the

9    important point is that's totally up to you.  You're the

10   judges now.  You run the show.  You decide when you

11   start deliberating; you decide when you stop.  You

12   decide how late today you want to deliberate.

13         We've been going home at 5:00 because that's

14   what I've been saying.  If you want to deliberate after

15   5:00, as late as you want, we're all going to stay here

16   and wait for you.  If you want to take a break and come

17   back tomorrow at any point, that's all up to you,

18   anytime between now and 5:00.  Now -- so understand that

19   you're in charge of the proceedings.  You'll decide when

20   you break.

21         If somebody needs a cigarette break or to call

22   a family member for something, you can take a break.

23   But you can't keep deliberating if one of the jurors

24   leaves the room.  If you take a break, you take a break.

25   If somebody needs to leave, deliberations must stop

1    until that juror or jurors return to the deliberation

2    room, number one.

3            Number two, alternate jurors.  We lost a

4    juror.  That means, under the law, juror number 13 is

5    now part of the jury of 12.  Okay?  Juror 13 will join

6    in the deliberations.

7            Now, juror number 14 will not, for now.  But

8    juror number 14 is still under an obligation.  There's

9    still no discussion allowed for juror number 14 with any

10   of you or anyone else regarding this case.

11           You're free to leave or to stay in the

12   courthouse, totally up to you.  You're welcome to stay

13   and we'll provide a comfortable place for you to stay

14   where you can do whatever you want, within reason.

15           Now -- but you may be summoned if for some

16   reason one more member of the jury has a family

17   emergency or becomes ill and has to leave and stop

18   deliberating for some reason.  Juror number 14 will then

19   join and at that point, jury deliberations will have to

20   start all over again.  You can't pick up, you know, on a

21   certain count or certain element.  You've got to start

22   all over again at the beginning, because that's what

23   deliberations require.  That shouldn't happen, but if it

24   does, that's what will happen.

25           But that juror 14, we'll be in touch with you.

1   If you decide to stay, that's fine.  If you decide to

2   leave, continue to obey my instructions, but we'll be in

3   touch with you if we need you to come back.  And, of

4   course, if there's a verdict reached, we'll let you know

5   right away so you'll know when you're off the hook.

6   Okay.

7            So you decide when you start and when you stop

8   and how long it takes.  There's no right or wrong answer

9   to how long this takes.  All right?  What's important is

10  that you consider all the evidence and deliberate on all

11  the evidence and give everybody a chance to be heard, if

12  everybody wants to be heard, as much or as little as

13  they want to be.

14           We need to swear in the court security

15  officer.

16           THE CLERK:  Yes, Judge.

17           Please raise your right hand.

18               (Court security officer sworn.)

19           THE CLERK:  Thank you.

20           THE COURT:  All right.

21           So, Charli, I'm going to ask you to discharge

22  the jury.  And then I'll -- first determine with the

23  jury whether they'd like to have lunch now or begin

24  their deliberations.  That's up to the jury.

25           THE CLERK:  All right.

 1                 THE COURT:  All right.  Anything from counsel?

 2                 MR. LANGE:  I'd like to approach after the

 3       jury leaves.

 4                 THE COURT:  No problem.

 5                 THE CLERK:  Please rise for the jury.

 6                          (Jury excused.)

 7                 MR. LANGE:  Number 13 will be set aside, right

 8       now, should she be sequestered?

 9                 THE COURT:  14.

10                 MR. LANGE:  14.

11                 THE CLERK:  14.  Yeah, I'm going to offer her,

12       if she wants to take lunch with her and then she can go

13       and exit down the hallway.

14                 MR. LANGE:  Thank you.

15                 I just need to --

16                 THE COURT:  You can be seated.

17                 MR. LANGE:  I need to put on the record the

18       objection I made earlier to the charge.

19                 With respect to what is not evidence, I object

20       to the second sentence in the second paragraph and

21       ask -- and just preserve my objection to the language

22       you should not be -- nor should you be concerned with

23       your opinion, favorable or unfavorable, of the

24       New Hampshire Institute of Agriculture and Forestry --

25       in parens, NHIAF, close parens -- its work, or the

1    federal grant program involved, end quote.

2            The basis for that is, I submit, that it

3    invades the province of the jury.

4            THE COURT:  All right.  Just to comment on

5    that, I told you before your objection was preserved,

6    and it is.

7            But I guess in the future, you know, if you're

8    going to make an objection like that, make it while

9    they're still here so if I -- if I were persuaded to

10   correct it, I could do it while the jury was still here.

11   That said, your objection is preserved.

12           MR. LANGE:  Thank you.

13           THE COURT:  I don't want to play games about

14   that.

15           All right.  So Charli will excuse -- we can go

16   off the record.

17               (Off-the-record discussion.)

18               (Jury excused at 12:44 p.m.)

19

20

21

22

23

24

25

C E R T I F I C A T E

          I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


Submitted: 3/30/17            _Liza W. Dubois_
                              Liza Dubois, RMR, CRR
                              Licensed Court Reporter No. 104
                              State of New Hampshire